**In re N.C., N.E.C.**

**Appeal of K.C. and R.R.M., Appellants.**

**Guardian Ad Litem and Lancaster County Children and Youth Service Agency.**

Superior Court of Pennsylvania.

Submitted July 31, 2000.
Filed Nov. 30, 2000.

---

Daniel H. Shertzer, Lancaster, for appellants.

Kim L. White, Elizabethtown, for Guardain Ad Litem, appellee.

David E. Alspach, Lancaster, for Lancaster County Children and Youth Service Agency, appellee.

Before DEL SOLE, JOHNSON and MONTEMURO *, JJ.

MONTEMURO, J.:

¶ 1 Appellants, K.C. (Mother) and R.R.M. (Father), appeal from an order entered in the Lancaster County Orphans

* Retired Justice assigned to Superior Court.

Court involuntarily terminating their parental rights regarding their sons, N.C., born December 9, 1988, and N.E.C., born February 17, 1990.[1] Since before the birth of their children, Mother and Father have resided together.

¶ 2 On December 1, 1993, the Lancaster County Children and Youth Service Agency (CYS) learned that Father was physically abusing E.C. and placed the child in emergency foster care. On January 5, 1994, Appellants signed a family service plan, and on February 16, 1994, signed a placement plan amendment for the return of E.C. to their home. The amendment required both parents to obtain psychological evaluations, complete recommended psychological therapy, demonstrate their ability to care adequately for E.C., and cooperate with the personal parent trainer provided by CYS. On March 1, 1994, the family court held an adjudication and disposition hearing at which it found that E.C. was an abused and dependent child. Accordingly, the court granted legal custody of E.C. to CYS, and approved the placement plan amendment.

¶ 3 On June 21, 1994, a six month review hearing was held in family court. CYS reported that, since the March proceeding, Appellants had both received psychological evaluations. Mother was diagnosed with mild retardation and bilateral hearing impairment, and Father was assessed as functioning at a borderline level. Since March, both parents had regularly visited E.C. at CYS and participated in parenting training. However, the personal parent trainer characterized Father's interaction as detached, and, after the hearing, the court continued E.C. in the custody of CYS for three more months.

¶ 4 On September 29, 1994, at the nine month review hearing, the personal parent trainer again reported that both parents were participating in parenting training. For that reason, and to make E.C. eligible for placement in a program for at-risk preschoolers, CYS recommended that E.C.

be returned to the physical custody of his parents. Thus, the court ordered CYS to relinquish physical custody of E.C. to Appellants. However, on November 8, 1994, caseworkers visiting the family observed a lump and puncture wound on the child's forehead. E.C. told the caseworkers that his father had struck him with a flashlight and CYS immediately resumed physical custody.

¶ 5 On December 12, 1994, the family court held a second adjudication and disposition hearing. At the hearing, the court again found E.C. dependent and approved a new placement plan that CYS and the parents had signed. The new plan required Appellants to complete individual counseling to address the abuse, and to demonstrate their ability to provide adequate parental care and their commitment to E.C.

¶ 6 On March 23, 1995, at the 15 month review hearing, CYS reported that neither parent had attempted to comply with the placement plan. The parents refused to cooperate with the personal parent trainer and often refused to meet with the trainer at all. CYS had also referred Appellants to Catholic Charities, but Appellants did not take advantage of services offered by that agency either. Based on the evidence presented at the hearing, the court continued E.C. in the custody of CYS.

¶ 7 On June 20, 1995, the court held the 18 month review hearing, at which the court approved a new placement plan amendment. The plan required Appellants to take parenting classes offered by the Spanish American Civic Association, attend counseling sessions at the Lancaster Guidance Center, provide physical and mental health treatment for both children, and resolve certain financial problems. The plan also required Mother to obtain treatment for her hearing impairment and Father to obtain employment and budget counseling. After the hearing, the court

1. To avoid confusion the children will be referred to as N.C. and E.C.

continued E.C. in the custody of CYS for six more months.

¶ 8 On August 19, 1995, Appellant's older son, N.C., was hospitalized for treatment of severe behavioral and emotional problems. Appellants participated in parenting training and family therapy at the hospital. On September 6, 1995, N.C. was discharged from the hospital and continued to receive outpatient therapy. After returning home, however, N.C.'s problems escalated again. Upon further assessment, N.C.'s therapists concluded that Appellants were not capable of implementing the techniques necessary to provide N.C. with the environment he needed to improve his mental and emotional health.

¶ 9 On October 10, 1995, at the 22 month review hearing for E.C., CYS reported that neither parent had completed a parenting training program, individual counseling or family counseling. Father had not obtained employment or budget counseling, and Mother had not addressed her hearing impairment. Appellants had also failed to address their financial problems and visited their sons only when CYS transported them for visits.

¶ 10 On October 26, 1995, N.C. was discharged from outpatient counseling and returned to Appellants' home, although a hospital counselor stated that she had observed no improvement in their parenting skills. After N.C. returned home, CYS continued to provide intensive in-home support for his parents. N.C. briefly reentered public school and enrolled in a therapeutic after-school program, but, on December 14, 1995, he was again hospitalized.

¶ 11 On January 2, 1996, the family court held an adjudication and disposition hearing in the interest of N.C. At the hearing, CYS caseworkers and mental health professionals who were treating N.C. recommended removing him from Appellants' care. The court found N.C. dependent, placed him in CYS custody and approved a placement plan proposed by CYS. The plan contained the same requirements as the plan for E.C., and an additional requirement that Appellants follow N.C.'s health reports and demonstrate their ability to meet his mental health needs. Shortly thereafter, on January 11, 1996, N.C. was discharged from the hospital and placed in foster care.

¶ 12 On April 8 and August 20, 1996, the family court held further review hearings that affected both children. At each hearing, CYS caseworkers again indicated that Appellants had not fulfilled their obligations under the placement plans. .

¶ 13 On January 28, 1997, the family court held the 37 month review hearing for E.C. and the 12 month review for N.C. Since the previous hearing, Mother had obtained a hearing aid which improved her ability to communicate with the children. Also, Appellants had attended three parenting classes offered by the Spanish Assembly of God. However, during visits with the children at CYS, they still did not exhibit competent parenting skills. Additionally, Father had been incarcerated during October and November, 1996, for failing to pay child support. CYS recommended permanency planning for E.C., but the court continued both children in the custody of CYS for six more months. The court also ordered psychological evaluations of Appellants with psychologists capable of communicating with Father in Spanish and sensitive to Mother's hearing impairment. Finally, the court ordered CYS to provide another in-home personal parent trainer to determine whether Appellants had learned necessary parenting skills and could apply those skills with their children.

¶ 14 On June 23, 1997, the family court held the 42 month review hearing for E.C. and the 17 month review hearing for N.C. A psychiatrist who had individually evaluated Appellants since the prior hearing, testified that Mother exhibited certain limitations, including mild retardation, a personality disorder and dysthymia, which made her too easily overwhelmed to care adequately for children with special needs.

Although Father was generally higher functioning than Mother, the psychiatrist found that Father exhibited borderline psychotic traits and was emotionally unavailable to satisfy his children's needs. In sum, the psychiatrist testified that, in his opinion, no amount of medical treatment and counseling would enable either Mother or Father to function adequately as a parent.

¶ 15 A licensed psychologist who had evaluated the children individually also testified. Regarding E.C., the psychologist opined that the child had developed a very strong attachment to his foster parents, that he wanted to be adopted by them and that he feared being forced to leave them. The psychologist advised that removing E.C. from his foster home would be seriously detrimental to his psychological and emotional health. Regarding N.C., the psychologist diagnosed hyperactivity and oppositional defiant disorders, conditions which make reliable structure essential to his ability to function. The psychologist recommended that the court order interactional assessments of N.C. with his foster mother and with Appellants to assess their respective abilities to provide the necessary structure.

¶ 16 A case counselor from the hospital at which N.C. had received treatment also appeared. According to the counselor, N.C. entered the hospital's program because of aggressive behavior toward younger children in his foster home. The counselor testified that although the aggressiveness had stabilized, the team of mental health professionals who treated N.C. believed that he required therapeutic foster care. The counselor also observed that N.C. exhibited indifference during interactions with Appellants.

¶ 17 Finally, a CYS caseworker testified that Appellants only visited the children when the agency collected them and transported them for visitation. She added that Appellants noticeably favored N.C., and on one visit even failed to acknowledge E.C. as their child. The caseworker also re-

ported that Father had obtained employment as of October 1997.

¶ 18 Based on this testimony and the recommendation of CYS, the court ordered permanency planning with a goal of adoption for both children on January 2, 1998. On March 16, 1998, CYS filed a petition for involuntary termination of Appellants' parental rights regarding E.C. and N.C. After conducting a hearing and reviewing the entire record, the court granted the petition and accordingly entered a decree *nisi* terminating parental rights. Appellants filed exceptions, which the hearing court denied, and this appeal followed.

¶ 19 In appeals involving termination of parental rights, our scope of review is broad. *In the Interest of Lilley*, 719 A.2d 327, 329 (Pa.Super.1998). We consider all the evidence as well as the hearing court's factual and legal determinations. *Id.* Our standard of review, however, is limited to determining whether the decree of the hearing court is supported by competent evidence and whether the court gave adequate consideration to the effect of such a decree on the welfare of the children. *Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064 (1994); *In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793 (1996), *appeal denied sub nom. Child M. v. Smith*, 546 Pa. 674, 686 A.2d 1307 (1996). However, if competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result. *Atencio, supra.*

¶ 20 In a proceeding to terminate parental rights involuntarily, the party seeking termination bears the burden to establish by clear and convincing evidence that termination is warranted under the Adoption Act, 23 Pa.C.S.A. § 2501, *et seq. Id.* Thus, in the instant case, CYS had the burden to prove that: (1) E.C. and N.C. had been removed from Appellants' care by the court or by voluntary agreement for at least six months; (2) the conditions which led to the removals continued to exist; (3) Appellants were unable or un-

willing to remedy those conditions within a reasonable time; (4) services reasonably available to Appellants were not likely to remedy those conditions within a reasonable time; and (5) termination of parental rights would best serve the needs and welfare of the children. 23 Pa.C.S.A. § 2511(a)(5). In determining whether termination is warranted under the Act, the hearing court must examine the totality of circumstances, consider all explanations offered by the parents, *In re Adoption of Charles E.D.M., II,* 550 Pa. 595, 708 A.2d 88 (1998), but always give primary consideration to the needs and welfare of the children. *Atencio, supra; In re J.E.,* 745 A.2d 1250 (Pa.Super.2000). With these principles in mind, we turn to the three issues that Appellants present for our review.

¶ 21 The first issue is whether CYS was justified in terminating Appellant's parenting training sessions at the Spanish Assembly of God (SAG). Appellants argue that the testimony of a SAG counselor shows that they could have remedied the conditions that led to removal of their children. Thus, according to Appellants, CYS was unjustified in terminating Appellants' training at SAG after three sessions and failed to prove the fourth prong of their burden. Indeed, the SAG counselor testified that Appellants acted appropriately toward E.C. and N.C. during SAG parenting sessions, had begun to learn competent parenting skills, and might possibly complete the requirements of their plan within a reasonable time. (N.T., 12/30/97, at 78–84).

¶ 22 However, in considering a petition to terminate parental rights involuntarily the court must give primary consideration to the developmental, physical and emotional needs and welfare of the children. *In re J.E., supra;* 23 Pa.C.S.A. § 2511(b). Moreover, because the hearing court is in the best position to evaluate the testimony, that court resolves any conflicts in the testimony. *In re A.L.,* 719 A.2d 363, 365 (Pa.Super.1998). In the instant case, the hearing court considered the testimony of the SAG counselor, but gave more weight to the testimony of the psychiatrist and CYS caseworker, who stated that Appellants were not capable of becoming competent parents within a reasonable time, no matter what further services they received. After examining and weighing all the evidence, the court concluded that, "despite superficial progress in the parenting classes, [Appellants] remained unable to assimilate and effectively utilize what they had been taught." (Trial Ct. Op. at 22).

¶ 23 We note that Appellants received services from a variety of agencies for over six years, and during that period failed to develop adequate parenting skills. The "reasonable time" requirement is intended to prevent children from growing up in an indefinite state of limbo, without parents capable of caring for them, and at the same time unavailable for adoption by loving and willing foster families such as the family which has raised E.C. since 1993. *Lilley, supra* at 334–35; *In re D.J.S.,* 737 A.2d 283, 287 (Pa.Super.1999). Although it is unfortunate that Appellants' inability to provide adequate care for their children stems at least in part from inherent deficiencies, the law is clear that parents who are incapable of performing parental duties are no less unfit than parents who refuse to perform them. *In re E.M.,* 533 Pa. 115, 620 A.2d 481, 484 (1993); *In re Julissa O.,* 746 A.2d 1137, 1142 (Pa.Super.2000). Thus, we conclude that competent evidence supports the hearing court's finding that Appellants have not made sufficient progress toward rectifying the problems that caused the removal of their children.

¶ 24 The second issue is whether the hearing court could choose not to enforce its own order for CYS to provide an in-home parent trainer after CYS presented evidence that compliance with the order would be futile. Appellants contend that the court erred by failing to enforce its

earlier order, but present no authority that this action constituted reversible error. The hearing court decided not to require an in-home parent trainer based on its analysis, discussed *supra*, of the testimony of the SAG counselor, psychiatrist and CYS counselor. After considering this testimony, as well as the fact that Appellants had not cooperated with an earlier in-home parent trainer, the trial court reconsidered its earlier order and determined that appointing another in-home parent trainer would be futile. Thus, we conclude that the trial court's finding that appointing an in-home parent trainer would be futile was supported by competent evidence, and the court did not err by declining to enforce its earlier order.

■ ¶ 25 The third issue is whether evidence that Appellants' residence of record was uninhabitable and that Appellants abused their pets was relevant. Appellants argue that this evidence was not relevant because they no longer lived in the home at the time it was condemned as uninhabitable, and because treatment of animals in their care is unrelated to treatment of children in their care.

■ ¶ 26 However, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. *In re Adoption of Durham,* 320 Pa.Super. 508, 467 A.2d 828, 832 (1983).[2] In the instant case, CYS had the burden of proving that the conditions leading to the removal of the children continued to exist. CYS presented testimony of a housing inspector who condemned Appellants' home after finding it uninhabitable, and of a health inspector who was called about the animals. These witnesses testified that, at the house, they found six emaciated dogs who had been either neglected or completely abandoned for so long that they had tried to eat the floorboards of the house, and had covered the walls and floors with feces and urine. As a result, the house was condemned and Appellants were charged with cruelty to animals.

¶ 27 Although Appellants testified that they no longer resided at the condemned home, it was their address of record with the court, where the children would officially be sent to reside if returned to Appellants' custody. Moreover, the fact that Appellants recently abandoned both a home and six living animals unquestionably makes it more likely that at the time of the hearing they remained unable to care for two children. Thus, the hearing court properly ruled that this evidence was relevant.

¶ 28 For the foregoing reasons, we conclude that the record contains ample evidence to support the conclusion that the criteria for granting involuntary termination were met, and that termination of Appellants' parental rights was required to assure that the children will be protected and cared for properly. It is time to give N.C. and E.C. a chance to have their fundamental needs met without the constant insecurity that comes with knowing that someday, perhaps in the unreasonably distant future, they might again be wrenched away from their committed and capable caregivers.

¶ 29 Order affirmed.

---

2. The Pennsylvania Rules of Evidence, including Pa.R.E. 401 which defines relevancy, did not become effective until October 1, 1998.