J-S32011-18

J-S32012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.K.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 105 MDA 2018 |

Appeal from the Decree Entered December 13, 2017
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s):  120-AD-2017
CP-22-DP-0000150-2015


| | | |
|---|---|---|
| IN THE INTEREST OF: K.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 106 MDA 2018 |

Appeal from the Decree Entered December 14, 2017
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s):  121-AD-2017
CP-22-DP-0000207-2015


BEFORE:   PANELLA, J., NICHOLS, J., and PLATT[*], J.

MEMORANDUM BY PANELLA, J.                    **FILED JULY 20, 2018**

_____

[*] Retired Senior Judge assigned to the Superior Court.

In these consolidated appeals,[1] K.C. ("Mother") challenges the decrees and orders from the Court of Common Pleas of Dauphin County entered on December 13, 2017, and December 14, 2017,[2] involuntarily terminating her parental rights to her daughter, K.K.C., born in May 2008, and son, K.M.C., born in July 2015 (collectively, "the Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, and changing the Children's permanency goal to adoption pursuant to 42 Pa.C.S.A. § 6351 of the Juvenile Act. Mother's court-appointed counsel has filed a petition for leave to withdraw as counsel and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). We grant counsel's petition and affirm the orders and decrees.[3]

The trial court set forth the factual and procedural background of this matter as follows:

> On April 24, 2014, Dauphin County Social Services for Children and Youth ("Agency") received a referral that Mother was 28 weeks pregnant and actively using Phencyclidine ("PCP"). K.M.C. was born PCP positive. Shortly after K.M.C.'s birth, following a

---

[1] We consolidated these appeals *sua sponte*.

[2] The order and decree regarding K.K.C. was entered on December 13, 2017. The order and decree regarding K.M.C. was entered on December 14, 2017.

[3] The trial court also granted the petition to voluntarily relinquish parental rights filed by K.K.C.'s father, A.E. Additionally, the trial court granted the petition for the involuntary termination of parental rights of the unknown father of K.M.C. Neither A.E., nor the unknown father, filed appeals or have participated in this matter further.

Shelter Care hearing held July 27, 2015, the Agency placed K.M.C. in an Agency foster home. On August 6, 2016, at the Adjudicatory and Dispositional hearing before a Juvenile Court hearing officer, K.M.C. was found dependent and placed under third-party court[-]ordered protective supervision with Mother's cousin. (N.T. p. 8; N.T. p. 11).

At that time, K.K.C. was in the care of maternal grandmother, having been adjudicated dependent on July 1, 2015. Because of concerns regarding grandmother's lack of appropriate supervision and failure to ensure K.K.C.'s regular attendance at school, the Agency filed a motion for removal from that home and placed K.K.C. in the same home as K.M.C. (N.T. p. 14). Both children have remained in that pre-adoptive foster home since that time. (N.T. p. 14).

On April 30, 2015, the [c]ourt ordered service objectives for Mother. Those objectives and Mother's compliance are as follows:

1.      Attend all court hearings, Agency meetings and treatment plan meetings.

        Mother attended all hearing[s] with the exception of one, held during Mother's inpatient drug treatment. (N.T. p. 17).

2.      Sign all releases of information requested by the Agency to ensure compliance with the service objective of obtaining mental health counseling.

        Mother failed to consistently and promptly respond to requests to sign release of information forms. (N.T. p. 17; N.T. p. 41).

3.      Notify the Agency of any change in residence or contact information.

        Mother failed to provide updated contact information. (N.T. p. 18).

4. <u>Follow through with all treatment discharge recommendations in order to limit the risk of relapse.</u>

Mother failed to follow through with treatment recommendations, as evidenced by her continued PCP positive urine testing. (N.T. 18). Mother entered a drug and alcohol treatment program in November 2017, after the Agency's filing of the Petition for Termination of Parental Rights on September 20, 2017. (N.T. pp. 18-20).

5. <u>Submit to urine screens three time[s] per week, plus random screens, to ensure sobriety.</u>

Of 272 urine screens, Mother appeared for only nine. Screens for which Mother failed to appear are presumed positive. (N.T. p. 22). As to the nine screens submitted, seven tested positive for PCP. (N.T. pp. 20-22).

6. <u>Work toward developing and utilizing effective coping skills in order to maintain sobriety.</u>

The positive urine screens evidence Mother's failure to accomplish this objective.

7. <u>Refrain from sharing a household or associating with any person involved with illegal drugs or drug or alcohol abuse.</u>

Mother did not provide the names of persons with whom she resided. Mother related to Agency Caseworker Rebecca Yost that the home in which Mother resided was over-crowded. (N.T. p. 31). During her visit there, Ms. Yost observed that many people entered and left the residence. (N.T. p. 30).

8. <u>Participate and successfully complete drug and alcohol treatment.</u>

Mother successfully completed an inpatient treatment program in February 2016. Mother returned for treatment again in November 2017. (N.T. p. 31).

9.    Properly budget finances.

Mother has not provided proof of employment, has had her electric service discontinued and has been evicted. (N.T. p. 31).

10.    Obtain and maintain safe, stable and suitable housing.

Mother has not maintained housing. She has resided with her mother in conditions not suitable for the children. (N.T. pp. 31-32).

11.    Find employment and establish an income.

Mother reported that she obtained employment but has not provided proof thereof[.] (N.T. p. 31).

12.    Seek treatment for diagnosed depression.

Mother sought the services of the Dauphin County Case Management Unit. (N.T. p. 32). However, Mother failed to consistently comply with medication management. (N.T. p. 32).

13.    Follow through with treatment recommendations.

Mother has not obtained outpatient treatment. (N.T. p. 33).

14.    Seek mental health assistance by working with the Dauphin County Case Management Unit caseworker.

Mother has inconsistently participated in treatment such that she is at risk of discharge from those services for lack of contact. (N.T. p. 33)[.]

Trial Court Opinion, 2/9/18, at 1-4.

On September 20, 2017, Dauphin County Social Services for Children and Youth ("the Agency"), filed petitions for goal change to adoption and

involuntary termination of parental rights. On November 3, 2017, the Children's guardian *ad litem*, Joy Waters Fleming, Esquire, filed a motion for appointment as guardian *ad litem* and legal counsel. In the motion, Attorney Fleming stated that she did not believe a conflict of interest existed due to her continued representation of the Children as both guardian *ad litem* and legal counsel.[4] On November 8, 2017, the trial court entered orders appointing Attorney Fleming as guardian *ad litem* and legal counsel for the Children. The trial court conducted the hearing on the petitions for goal change to adoption and involuntary termination of parental rights on December 13, 2017. The Agency called Rebecca Yost, the caseworker for the Children. K.K.C.'s father, A.E., testified on his own behalf. Mother testified on behalf of herself.

The trial court terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and changed their permanency goal to adoption. Mother's counsel, Damian J. DeStefano, Esquire, filed timely notices of appeal. Counsel indicated in the notices of appeal that he concluded there are no non-frivolous issues to be raised on

---

[4] In ***In re Adoption of L.B.M.***, 161 A.3d 172 (Pa. 2017) (plurality) (initially filed on March 28, 2017), our Supreme Court held that § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. With respect to this Court's holding in ***In re K.M.***, 53 A.3d 781 (Pa. Super. 2012), that a GAL who is an attorney may act as counsel pursuant to § 2313(a), as long as the dual roles do not create a conflict between the child's best interest and legal interest, the ***L.B.M.*** Court did not overrule it.

appeal, that he intended to file a petition to withdraw, as well as an *Anders* brief, and that he therefore did not intend to file a concise statement of errors complained of on appeal.

Attorney DeStefano has filed petitions for leave to withdraw as counsel and *Anders* briefs, which we must address before reviewing the merits of this appeal. Attorney DeStefano has complied with the mandated procedure for withdrawing as counsel. *See Santiago*, 978 A.2d at 361 (articulating *Anders* requirements); *Commonwealth v. Daniels*, 999 A.2d 590, 594 (Pa. Super. 2014) (providing that counsel must inform client by letter of rights to proceed once counsel moves to withdraw and append a copy of the letter to the petition). Mother has not filed a response to counsel's petitions to withdraw.

We next proceed to review the issues outlined in the *Anders* briefs, which are as follows:

1. Whether the trial court abused its discretion when it[] changed the goal from reunification to adoption?

2. Whether the trial court abused its discretion when it involuntarily terminated appellant mother's parental rights?

*Anders* Briefs, at 11.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the

findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (internal citations omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act. The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

We may affirm the court's decision regarding the termination of parental rights with regard to any *one* subsection of § 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Although the trial court focused its analysis on § 2511(a)(8) and (b), we will discuss only § 2511(a)(2) and (b).

Subsection (a)(2) provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

23 Pa.C.S.A. § 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

- 9 -

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

A parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re A.L.D.*, 797 A.2d at 337. And a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *See id*., at 340.

In addressing § 2511(a), the trial court concluded:

Clear and convincing evidence, cited in detail, *supra*, establishes grounds for termination…. The record reflects that K.M.C. was removed from Mother's care at the time of his birth on [in July 2015] and K.K.C. on April 5, 2016. (N.T. pp. 8-9). Therefore, more than 12 months have elapsed since the date of placement. The children have remained in the pre-adoptive kinship foster home since that time.

We recognize that Mother professes to love the children and seeks additional time within which to continue with substance abuse treatment and prove that she can properly parent her children. …

The record overwhelmingly establishes that the conditions which led to removal continue to exist. Although Mother complied with some of the objectives, she has failed to demonstrate sustained commitment to recovery from her drug addiction. In spite of the services made available to her, she has yielded to devastating drug abuse. As a result, she lacks employment and a suitable home for the children.

Trial Court Opinion, 2/9/18, at 7-8.

Our review of the certified record supports the trial court's finding of sufficient grounds for termination under subsection (a)(2). K.M.C. was born in July 2015 and tested positive for PCP. **See** N.T., Termination Hearing, 12/13/17, at 8-9. Both Children have been out of Mother's care since at least August 2015. **See id**., at 10-11. Further, her visitation with the Children was minimal. **See id**., at 33-34.

In August 2015, Mother underwent a drug and alcohol evaluation, which recommended Mother attend two outpatient group sessions and one outpatient individual session per week. **See** N.T., Termination Hearing, 12/13/17, Exhibit 13. Mother did not follow through with the treatment discharge recommendations. **See id**., at 18-19. Mother attended four different outpatient drug and alcohol treatment centers. **See id**., at 41. All discharged Mother unsuccessfully. **See id**. Out of 272 urine screens requested, Mother submitted just nine. **See id**., at 20. Mother tested positive for PCP on July 27, 2015, August 6, 2015, September 16, 2015, December 30, 2015, January 3, 2017, January 17, 2017, March 22, 2017, and July 5, 2017. **See** N.T., 12/13/17, Exhibit 15.

Further, Mother failed to comply with her service objectives. Mother did: attend court hearings, Agency meetings, and treatment plan meetings; seek treatment for depression; comply with her medication management; and seek additional mental health assistance. **See id**., at 17-23, 30-34. However,

Mother failed to comply with her other service objectives. Mother did not: notify the Agency within 24 hours of a new residence or new contact information; sign release of information forms in a consistent and timely manner; follow through with all treatment discharge recommendations; submit to urine screens three times a week; show effective coping skills to maintain sobriety; avoid persons involved with illegal drugs; participate in and successfully complete inpatient drug and alcohol treatment; manage her finances; find safe stable and suitable housing; obtain employment; or, follow through with all recommendations of treatment. *See id*.

Mother has been in danger of being discharged from her depression treatment program due to her lack of contact. *See id*., at 32. Mother also did not develop and utilize effective coping skills to maintain sobriety, as demonstrated by her positive urine screens. *See id*., at 21-22. Mother last attended drug and alcohol treatment in November 2017. The facility successfully discharged Mother on December 5, 2017, approximately one week before the termination hearing. *See id*., at 45-47. Mother scheduled follow up care for after the hearing. *See id*., at 47-48. At the time of the December 13, 2017 hearing, Mother lived with her mother and uncle. *See id*., at 44. She did not work. *See id*.

Mother testified at the hearing, "I admit that I have an addiction, but it's not an overnight process. It's something that I have to work through, and some things I have to get through. I know I wasn't stabilized. I know I wasn't

right for my kids. I realize that. But some people deserve a chance. I'm trying to focus. I'm getting myself together, and I'm knowing I have to be a parent to my kids." *Id*., at 50.

"[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. Moreover, Mother cannot or will not remedy this situation.

Thus, as confirmed by the record, termination of Mother's parental rights serves the Children's best interests pursuant to subsection (a)(2).

We next determine whether termination was proper under § 2511(b). This Court has stated that the focus in terminating parental rights under subsection (a) is on the parent, but it is on the child pursuant to subsection (b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have

been properly interpreted to include intangibles such as love, comfort, security, and stability. … [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations, brackets and quotation marks omitted; brackets added).

"[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). And "a parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe

environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal

citations omitted).

The trial court explained its analysis of subsection (b) as follows:

> In deciding the issue of the best interests of a child, our Appellate Courts have noted that it is essential to allow a child "a chance to have his fundamental needs met without the constant insecurity that comes with knowing that someday, perhaps in the unreasonably distant future, he might again be wrenched away from his committed and capable caregiver." ***In re N.C.***, 763 A.2d 913, 919 (Pa. Super. 2000). K.M.C. has resided with the kinship foster family since birth, and K.K.C., since February 2016. (N.T. p. 35). In that home, the children have received the care and attention needed to address their developmental and educational concerns: K.M.C. for speech delays related to having been born PCP positive and K.K.C. for educational delays related to missed schooling from kindergarten through second grade. (N.T. pp. 35-36). Both children have made significant progress in their development. ***Id.***

> We do not doubt that Mother loves her children. However, we see no evidence of a bond with Mother which, if broken, would cause detriment to them. Mother visited K.K.C. only sporadically, and typically incidental to her visiting her mother. (N.T. p. 34; N.T. p. 42). Mother did not participate in the orientation and visitation schedule at the YMCA. (N.T. p. 33).

> We recognize that Mother seeks additional time within which to pursue drug treatment and demonstrate the ability to care for the children. However, a continued lack of permanency with the potential of removal from a capable and loving home would be contrary to their best interests.

Trial Court Opinion, 2/9/18, at 9-10.

Upon review, we again discern no abuse of discretion. The record

supports the trial court's finding that the Children's developmental, physical

and emotional needs and welfare favor termination of Mother's parental rights pursuant to subsection (b).

Both of the children reside in a kinship placement with Y.S. and J.M. ("Foster Parents"). K.M.C. has lived with Foster Parents since birth. *See* N.T., Terminating Hearing, 12/13/17, at 35. K.K.C. has lived with Foster Parents since February 2016. *See id*. The home is a pre-adoptive placement. *See id*. The Children are comfortable in the home and are doing very well. *See id*., at 36-37. Foster Parents address the developmental concerns regarding K.M.C. and the educational issues of K.K.C. *See id*., at 36. K.M.C. no longer needs occupation or physical therapy but continues to attend speech therapy. *See id*., at 35-36.

Rebecca Yost, the caseworker, testified Mother received referrals to the YWCA on three occasions for formal visitation but Mother did not attend orientation. *See id*., at 33. She described Mother's visitation with the Children as minimal. *See id*., at 34. Ms. Yost testified that K.M.C. has no bond with Mother, as he has never been in Mother's care. *See id*., at 37. She believed K.K.C. and Mother have a bond "to some degree," but opined that it would not be detrimental to K.K.C. to terminate the parental rights of Mother. *See id*., at 37-38.

Thus, as confirmed by the record, termination of Mother's parental rights serves the Children's developmental, physical and emotional needs and welfare and was proper pursuant to subsection (b).

Counsel's **Anders** briefs also assert the trial court erred in changing the goal to adoption. Our standard of review in a dependency case is as follows: "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." **In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). "We review for abuse of discretion[.]" **In re L.Z.**, 111 A.3d 1164, 1174 (Pa. 2015) (citation omitted).

Regarding the disposition of a dependent child, § 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child. When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

**In re A.K.**, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Additionally, § 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> * * *
>
> > (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

On the issue of a placement goal change, this Court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. **_See In re Sweeney_**, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent … the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." **_In re E.F.V._**, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

**_In re K.C._**, 903 A.2d 12, 14-15 (Pa. Super. 2006).

The record reveals that a change of permanency goal to adoption is in the Children's best interest. The Children are in a stable home and are doing well. At the same time, Mother continued to test positive for PCP and failed to

meet many of her service objectives. As we find that the record supports the trial court's conclusion that the goal change was in the best interest of the Children, we discern no abuse of discretion.

Based on the foregoing independent analysis of the trial court's termination of Mother's parental rights and goal change to adoption, we agree with counsel for Mother that the within appeal is wholly frivolous.[5] As such, we affirm the decrees and orders of the trial court, and grant counsel's petition to withdraw.

Decrees and Orders affirmed. Petitions to withdraw as counsel granted.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/20/2018

---

[5] Further, we note that our independent review of the record did not reveal any additional, non-frivolous issues overlooked by counsel.