J-A16010-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.A., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 238 EDA 2022 |

Appeal from the Decree Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000294-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 239 EDA 2022 |

Appeal from the Decree Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000295-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 240 EDA 2022 |

Appeal from the Decree Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000486-2021

BEFORE: McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:　　　　　**FILED SEPTEMBER 6, 2022**

J.A. ("Father") appeals from the decrees terminating his parental rights to his three children. Father argues the court erred in concluding the Department of Human Services ("DHS") presented clear and convincing evidence to support termination because Father was substantially compliant with his case objectives and always demonstrated a desire to maintain his parental status. We affirm.

Father had three children with S.P. ("Mother"): J.J.A., Jr. ("J.A.") (born 2015), A.G.A. ("A.A.") (born 2017), and S.R.A. ("S.A.") (born 2020). DHS became involved with the family in August 2017, prior to S.A.'s birth, after learning that J.A. and A.A. were living in a home infested with cockroaches and that A.A. required intensive medical care, including a gastronomy tube. DHS was also informed that Father and Mother were "intellectually delayed" and unable to properly care for the children. Trial Court Opinion, filed 3/17/22, at 2-3.

DHS engaged Family Empowerment Services to assist the family. However, DHS subsequently received several General Protective Services ("GPS") reports about the family. The reports detailed that Father and Mother were failing to provide adequate medical care for the children and refusing an in-home nurse for A.A. The reports further stated that the home and children

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

were dirty and unkempt; and Father and Mother had "unidentified disabilities or delays." *Id.* at 3-4. DHS investigated further and found the parents unable "to grasp the severity of [A.A.]'s condition" and observed that J.A. was developmentally delayed. Dependency Petition, 11/15/17, ¶ 5, at l., m. DHS reported,

> [A.A.] was hospitalized due to complications from a G-tube and ear infection. [A.A.] has a genetic disease called 22Q11 and cardiac issues. She has a g-tube that is not kept clean and the parents are not feeding correctly causing the child to lose weight. There was a nurse coming to the home but [M]other "fired" her and refuses services. . . . DHS visited the home and found it to be inappropriate for a medical[ly] needy infant. The home is overcrowded, numerous animals in the home and feces from the animals throughout the home. There [are] only two beds and one is covered with dirty laundry. It was also learned that [J.A.], age 2 is autistic. He was receiving services through Child Link but [M]other also stopped allowing Child Link to continue working with [J.A.].

Order for Protective Custody, 11/18/17, at 3 (unpaginated). At one point, A.A.'s heart medication ran out and the parents did not refill the prescription because they thought A.A. no longer needed it. Trial Ct. Op. at 6.

DHS obtained an Order of Protective Custody for J.A. and A.A. in November 2017. Following a shelter care hearing, DHS placed J.A. in kinship care with his maternal great-aunt ("Maternal Aunt"). A.A. was transferred from the hospital to a medical facility and later to a pediatric specialty group home.

The court held an adjudicatory hearing and adjudicated the children dependent. The court referred the parents to the Behavioral Health System

("BHS") for a psychological evaluation and IQ testing and to the Achieving Reunification Center ("ARC"). The court ordered DHS to create a Single Case Plan ("SCP") and to refer the parents for parenting capacity evaluations ("PCEs") and Family School. DHS was also to refer J.A. for early intervention services. The court ordered the parents to have supervised visits with the children. *See* Order of Adjudication and Disposition, 11/17/17.

In March 2018, an initial Single Case Plan ("SCP") was created. Father's objectives included:

- obtain appropriate housing;

- attend ARC and adhere to all recommended services;

- participate in the PCE;

- attend all medical appointments for the children;

- attend scheduled visits with Children; and

- sign all necessary releases.

Trial Ct. Op. at 9.

The SCP was later revised to include: compliance with Intellectual Disability Services ("IDS") and develop and implement a family budgeting plan. *Id.* at 11-12. The court held periodic permanency review hearings to monitor the parties' progress.

In June 2020, Mother gave birth to S.A. prematurely. Upon S.A.'s discharge from the NICU, DHS obtained an order of protective custody and placed S.A. with Maternal Aunt. The court adjudicated S.A. dependent in

September 2020 and ordered that the parents have liberal visits with the children while supervised by Maternal Aunt.

The court revised the SCP in March 2021, adding that Father and Mother were to participate in a domestic violence assessment. Trial Ct. Op. at 18. DHS placed A.A., whose leg had been surgically amputated and was wheelchair-bound, with Maternal Aunt that July. N.T., 12/15/21, at 65.

The following month, DHS filed petitions to change the permanency goals for the children to adoption and for involuntary termination of Father's and Mother's parental rights to the children under Sections 2511(a)(1), (2), (5), and (8).[1] *See* 23 Pa.C.S.A. § 2511.

At a hearing on the termination and goal-change petitions, in December 2021, the court heard expert testimony from Dr. Erica Williams, a psychologist at Forensic Mental Health Services who had completed the PCE of Father in July 2018. Trial Ct. Op. at 22. At that time, Dr. Williams had "determined to a reasonable degree of professional psychological certainty that Father did not present with the capacity to provide safety and permanency for his Children." *Id.*

Dr. Williams found Father "presented with noticeable cognitive limitations" and lacked an ability "to meet the basic needs with housing, finances, understanding the basic care of the Children, [or meet] their medical

---

[1] DHS had filed an initial set of petitions for J.A. and A.A. in April 2019 which the court had held in abeyance. *See* Permanency Review Order, J.A., 1/21/20, at 2; Continuance Order, J.A., 6/11/19, at 1.

needs[.]" *Id.* at 22, 24. Dr. Williams also said that Father failed to "understand the reason the Children came into care," believing the situation would resolve if DHS provided the family with a home. *Id.* at 22. Father told Dr. Williams that all missed medical appointments "were the problem of [Mother]," and blamed A.A.'s needs on the nursing staff. *Id.* Dr. Williams also observed that A.A. has complex needs, requiring a parent have the ability to read and write independently. *Id.* at 23.

Dr. Williams recommended Father engage in therapy to help him understand what the issues were, to take responsibility for them, and to understand what barriers his cognitive limitation might present and to create safeguards against them. *Id.* Dr. Williams testified that if Father was not able to care for the children with the support of Family School, she would be concerned that Father would be unable to transition to unsupervised care. *Id.* She stated that Father might not progress without consistently engaging in therapy, and that even if he did, this would not guarantee Father had gained the capacity to parent safely. *Id.* at 23, 24. Dr. Williams also noted that Father had been inconsistent with visiting the children at the time of the PCE, and cautioned that if his inconsistency had continued, "it would affirm that there's that limitation of being able to make and keep appointments for himself, never mind his Children." *Id.* at 24.

The court also heard the testimony of Tiyonna Pelzer, the case manager with the Community Umbrella Agency ("CUA") from September 2020 through August 2021. She testified that Father had completed parenting classes but

did not want to attend Family School "because they had bumble bees and he was allergic to them." *Id.* at 25. Pelzer testified that Father was also inconsistent in participating in his mental health treatment, and when she asked him why he had stopped attending treatment, Father responded that the therapist had stopped calling him. *Id.* at 25-26. Father also failed to engage with IDS "due to insurance issues." *Id.* at 26. Furthermore, Father never provided Pelzer with proof of his income from his alleged construction job. Father also never provided documentation to prove the family had a right to reside in Father's parents' home, and never developed a financial plan. *Id.*; N.T. at 73.

Pelzer further testified that Father never came to understand why the children came into care and his role in it, and still blames a nurse for the children's removal. Trial Ct. Op. at 26. Pelzer stated that domestic violence was an ongoing issue at the time she left the case, but Father had refused to attend domestic violence counseling. *Id.*; N.T. at 74.

Pelzer testified that Father was also inconsistent in attending A.A.'s medical appointments and in visiting the children. Trial Ct. Op. at 25. Early in the case, Pelzer observed the supervised visits at the agency, where Father "was not hands-on with the Children and instead would just watch Mother play with them." *Id.* Pelzer also observed Father yell at J.A. until he sat in the corner with his head down. *Id.* at 27. During visits with Father, J.A. would ask if he could go home when the visit was over, or ask for his Maternal Aunt or grandmother. N.T. at 78. When Father visited A.A., she "almost [tried] to jump

out of her wheelchair" when she saw him. *Id.* S.A. would just "yell and scream" when handed to Father. *Id.* at 79. Father would also leave visits early and would skip visits, claiming he had to work. Trial Ct. Op. at 26. When visitation transitioned to Maternal Aunt's house, Pelzer would provide transportation passes, but Father only attended one visit. *Id.*; N.T. at 76.

Pelzer stated that she believes Father is not capable of meeting the children's needs and that the children do not share a parental bond with Father. Trial Ct. Op. at 26, 27. In contrast, with Maternal Aunt, "all their needs are being met and they are safe." *Id.* at 27. According to Pelzer, "[a]ll three [c]hildren are bonded to the Maternal Aunt and look to her for love, protection, and support." *Id.* Pelzer believes the children would not suffer irreparable harm if Father's parental rights were terminated and that it would be in the children's best interests to be adopted by Maternal Aunt. *Id.*

DHS also presented the testimony of Danielle Enguero, the CUA case manager as of October 2021. Enguero testified that she could not confirm Father's mental health treatment because Father never showed up to his appointment to sign releases. *Id.* Father has not provided her with any documentation regarding his housing, has not engaged in domestic violence counseling, and has not attended any medical appoints for the children since she began supervising the case, including when A.A. was hospitalized in November 2021. *Id.*; N.T. at 98. Father has continued to be inconsistent in visiting the children. Trial Ct. Op. at 27.

Enguero testified that all three children now live with Maternal Aunt and that they "are very well adjusted in the Maternal Aunt's home and are thriving." *Id.* at 28. J.A., who is autistic, attends first grade, and A.A., who has an in-home nurse five days a week, has enrolled at the same school. *Id.*; N.T. at 102. S.A. has no special medical or developmental needs. Trial Ct. Op. at 28.

The court-appointed child advocate for the two older children also addressed the court. She stated that J.A. is 6 years old and A.A. is 4 years old, and they both have special needs. *Id.* After visiting the children twice, the child advocate "could tell they were loved and well taken care of and they both wanted to stay with Maternal Aunt." *Id.* at 30. Father did not testify.

The court granted the petitions, having found DHS provided clear and convincing evidence of the statutory requirements for termination pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) and that adoption is in the best interest of the children.

Father appealed from the decrees terminating his parental rights.[2] He presents his issue as follows: "Did the Trial Court err in terminating [Father]'s parental rights under 23 Pa.C.S.A. Sec. 2511(a)(1), (a)(2), (a)(5), (a)(8), & Sec. 2511(b)?" Father's Br. at 4.

---

[2] Mother appealed from the orders terminating her parental rights, as well as from the orders changing the permanency goals to adoption. Her appeals are docketed at Nos. 231, 232, 234, 235, 236, and 237 EDA 2022.

Father first argues that the court erred in finding clear and convincing evidence warranting termination under Section 2511(a). Father argues that termination was not proper under Subsection 2511(a)(1) because he "always demonstrated a serious intent, willingness, and capacity to care for his children" and never "a settled purpose to relinquish [his] parental claim." *Id.* at 11. He argues that Pelzer testified that Father was involved in the children's care and attended some medical appointments for A.A. Father also argues termination was not warranted under Subsection 2511(a)(2), because Father found appropriate housing with his mother, who had inherited property from her parents. Father further contends none of the evidence established that the conditions causing the original placement could not be remedied.

As for Subsection 2511(a)(5), Father claims termination is not warranted because Father did not decide to terminate the relationship for any six-month period, as he participated in a PCE, some mental health therapy, completed parenting classes, and obtained appropriate housing. Father also visited with his children to the extent that his work obligations would allow. Finally, Father argues the evidence does not support termination under Subsection 2511(a)(8), because Father obtained suitable housing, completed the PCE, attended therapy, parenting classes, and some medical appointments and visits with the children, and only missed others due to his employment.

Father next argues that termination would not serve the children's needs and welfare under Section 2511(b). He states that "although [he] did not fully complete his goals, given his intellectual delays his attempts to continue his

therapy sessions together with his completion of parenting [classes] demonstrated his sincere effort to bond with and express his love for his children. Given the opportunity[,] the children could have established a stronger bond with Father." *Id.* at 16.

We review the termination of parental rights for an error of law or abuse of discretion. *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). So long as the record supports them, we will accept the factual findings and credibility determinations of the trial court. *Id.*

The party seeking involuntary termination of parental rights must establish, by clear and convincing evidence, that termination is warranted under Sections 2511(a) and (b). *See* 23 Pa.C.S.A. §§ 2511(a), (b); *In re Z.S.W.*, 946 A.2d 726, 728 (Pa.Super. 2008). The statutory grounds for termination listed under Section 2511(a) focus on the conduct of the parent. 23 Pa.C.S.A. § 2511(a); *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa.Super. 2006).

Subsection 2511(a)(8) permits termination when:

The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Under this subsection, a parent's willingness or ability to remedy the conditions that initially caused the placement, and the efficacy of reunification

- 11 -

services, do not factor into the analysis. *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa.Super. 2006); *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super. 2003). This is because, after 12 months of placement, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* (quoting *In Re: J.T. and R.T.*, 817 A.2d 505, 509 (Pa.Super. 2003)). Even if the parental incapacity is inherent and faultless, "the law is clear that parents who are incapable of performing parental duties are no less unfit than parents who refuse to perform them." *See In re: N.C.*, 763 A.2d 913, 918 (Pa.Super. 2000).

If the court determines that grounds for termination have been established under Section 2511(a), the court must then determine whether termination of parental rights is in the child's best interest under Section 2511(b). That provision states, "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). A major component of this analysis "concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007).

The court credited the testimony of Dr. Williams, who had evaluated Father's capacity for parenting in 2018, as well as that of Pelzer and Enguero, the two caseworkers providing reunification services to Father. *See* Trial Ct.

Op. at 22, 25; N.T. at 143-44. The court also relied on its "own history with this case, having adjudicated and presided over many review hearings." N.T. at 144-45.

The court observed that the older children have been in placement for over four years and Father still lacked the capacity to safely parent them. Regarding the progress made by the parents, the court opined,

> [W]hat I heard today was that the parents have not changed their status regarding their ability to parent these children. They may have attended some classes. They may have . . . completed some classes and gotten attendance, but -- and it's a phrase that the doctor used: compliance is not competence. . . . And it's important because the same status exists now. While the parents have partially complied with the requirements, they complied with the requirements when they feel like it.

> * * *

> The other issues involved are the parents' inability to understand the needs of these children, understand the ability to—they do not have the ability to understand communications which may attend all of the treatment and care for the children. . . . They would need someone to read those documents and interpret them for them in order for them to understand the needs of the children. And the needs of these children are not simple needs.

> * * *

> [T]he parents have not progressed one bit in their understanding of the case, of their understanding of the needs of the children, [and] have not progressed in their ability to parent, [which] is the key issue here.

> When you have children with needs like this, the children's needs are escalated, and the parents have to have the ability to meet that escalation. The parents haven't changed their ability to meet the needs of these children since the children were taken into care. They've not demonstrated any additional ability to parent these children.

- 13 -

*Id.* at 139, 140, 144-45.

The court also considered the children's needs and welfare, and Father's bonds with the children. It credited the testimony that A.A. does not want to reunite with Father, that S.A. has never been in Father's care, and that neither have a parental relationship with Father. *Id.* at 141, 144. The court found that while J.A. recognizes his parents, the testimony established that Father and J.A. do not share a parental bond. *Id.* at 144. The court also relied on the testimony that the children are receiving care and security from Maternal Aunt, and there would be no irreparable harm if Father's rights were terminated. *Id.* The court concluded,

> [M]y test is not whether you're going to be sad because I'm going to terminate your parental rights. It's whether terminating the parental rights is in the best interest of the children and are we going to be able to provide a better future for these children when they're in someone else's care? And the answer for me is a resounding yes for all three children, supported by evidence which is clear, convincing, and essentially uncontradicted.

*Id.* at 145.

The record supports the trial court's conclusion that DHS presented clear and convincing evidence supporting involuntary termination of Father's parental rights under Subsections (a)(8) and (b). *See* 23 Pa.C.S.A. § 2511(a)(8), (b). It is uncontradicted that all three children have been removed from Father's care for a period exceeding 12 months.

In addition, the conditions leading to the removal of the children persist. The children were removed due to medical neglect coupled with their parents'

inability to recognize their children's issues or maintain a safe and stable home. As Father acknowledges, he did not complete all of the objectives designed to help him remedy these conditions. While he may have engaged in some mental health treatment and completed a parenting course and PCE, Father did not complete his course of mental health treatment, nor did he complete Family School or adhere to the requirements that he maintain scheduled visits with his children, create a financial plan for his family, or engage with IDS. Significantly, Father never engaged in domestic violence counseling, despite the ongoing concerns regarding violence in the home. Dr. Williams opined that Father's cognitive ability might prevent him from ever developing the capacity to safely parent, and the testimony of Pelzer and Enguero reflected that Father had not progressed in his understanding of his critical role and responsibilities as a parent.

Finally, the evidence supports that termination best suits the needs and welfare of the children—relevant here under both subsection 2511(a)(8) and (b). The children have no parental bond with Father and are thriving with Maternal Aunt, who is willing to adopt them.

For the foregoing reasons, we affirm the decrees terminating Father's parental rights to the children. As we affirm termination under Subsection (a)(8), we need not determine whether grounds for termination were established under the other subsections. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Decrees affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/6/2022