J-A02026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: S.P.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| APPEAL OF: G.M., III | : | |
| | : | No. 1059 MDA 2018 |
| Appellant | : | |

Appeal from the Decree Entered June 6, 2018
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  47 AD 2018

BEFORE:  LAZARUS, J., DUBOW, J., and NICHOLS, J.

DISSENTING MEMORANDUM BY NICHOLS, J.:          **FILED JUNE 18, 2019**

I disagree with the majority and would conclude that the trial court erred in granting CYS's petition based on Section 2511(a)(2) and (b).  Therefore, I respectfully dissent.

A review of the record reveals the following background to this case. CYS did not contest the fact that Father performed parental duties and developed a close bond with Child before his incarceration in May 2016.  **See** N.T., 6/4/18, at 14-15.  Father resided with Child for the first four years of Child's life.  **Id.** at 7-34.  In 2014, Father separated from Child's mother, but maintained visitation with Child during 2014 and 2015.  **Id.** at 45.  According to Heather Gutshall, a CYS caseworker, Father "was a great father, [and he] was the identified father for all the siblings because the other fathers were not part of their lives.  He would go to activities.  He would go to school.  He did things with them that the other fathers did not."  **Id.** at 15.

At the end of May 2016, Father was taken into custody in Cumberland County for criminal charges involving possession with intent to deliver and a firearm. *See* CP-21-CR-000187-2016 (187-2016) (indicating Father was arrested on May 30, 2016). In June 2016, while Father was in Cumberland County Jail, CYS removed Child from her mother's care and took custody of Child. *See* N.T., 6/4/18, at 5, 29.

Father testified that he remained in Cumberland County Jail between June 2016 and February 2017. During that time, he attempted to remain in contact with Child. *Id.* at 33. Father explained that on one occasion, he spoke to Child on the phone during a three-way call with his sister. *Id.* However, Father stated that after he spoke to Child, her foster family indicated that Child "kind of got upset and was crying and saying she missed" him. *Id.* Father asserted that he coordinated with his mother to send gifts and clothes to Child and her foster siblings. *Id.* at 33-34. He also testified that he sent Christmas gifts to Child through a local church organization in December 2016. *Id.* at 33, 40.

On January 17, 2017, Father pled guilty at docket 187-2016 and was sentenced to forty-two to eighty-four months' imprisonment. In February 2017, Father was transferred from Cumberland County Jail to SCI-Camp Hill. *Id.* at 30. Father remained at Camp Hill from February 2017 to July 2017.

While at Camp Hill, Father wrote directly to Child on April 2, 2017, May 6, 2017, and June 12, 2017. *Id.* at 35. Father testified that he did not receive

responses from Child or from her foster family. *Id.* at 36. Father also continued to communicate with CYS.

In an April 2, 2017 letter to CYS, Father explained that he was unable to get in contact with his appointed counsel in this matter. Father's Ex. 2 at 1. He explained that his mother and sister were working with CYS to get custody of Child while he was in prison, and indicated that he wanted Child to stay with them "until she is able to be with me." *Id.* He also requested information from CYS about scheduling visitation with Child. *Id.* Finally, Father requested information about "everything I have to do to work towards getting my daughter back one day." *Id.*

In a May 8, 2017 letter to CYS, Father indicated that he never received a response to the April 2, 2017 letter. *Id.* at 7. Father again asked what he needed to do to protect his parental rights.

In a June 12, 2017 letter to CYS, Father indicated that he received the information from CYS regarding prison programs. *Id.* at 9. However, he explained that he was still assigned to the Classification Unit at Camp Hill, which precluded him from participating in any prison programs until he was assigned to his "home jail." *Id.*

In a July 5, 2017 letter to CYS, Father indicated that he was transferred to SCI-Pine Grove, and he was on the waiting list for the programs that CYS instructed him to complete. *Id.* He also inquired about his letters to Child, and indicated that he had not gotten a response or any confirmation that she

had received them. *Id.* On July 11, 2017, the trial court found aggravated circumstances against Father based on his limited contact with Child.[1]

With respect to visitation with Child, Father testified that DOC rules precluded him from placing a minor on his visitors list or on his phone list. N.T., 6/4/18, at 30-31; 46. Although Child's foster family could have been added to Father's vistors list, he indicated that CYS instructed him to go through the Agency, and not to contact the foster family directly under any circumstances.[2] *Id.* at 46. Appellant continued to remain in contact with Child either directly or through his mother.

On May 3, 2018, CYS filed the petition to terminate Father's parental rights under 23 Pa.C.S. § 2511(a)(1), (2), and (b). The trial court held a hearing at which Ms. Gutshall testified in support of the petition. Father, who

---

[1] Father did not appeal the finding of aggravated circumstances.

[2] The Pennsylvania Dependency Benchbook (Benchbook) includes an entire section on dependency cases involving incarcerated parents. Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, Pennsylvania Dependency Benchbook §§ 8.1-8.8 at 126 (2014). Specifically, the Benchbook recommends that the hearing judge order an incarcerated parent to appear at every hearing, either by transport or through video conferencing. *Id.* at § 8.3. With respect to visitation, the Benchbook notes that a court should order visitation, as many institutions do not permit contact visits without a court order, and there is a lack of written county protocol for working with incarcerated parents with dependent children. *Id.* § 8.4. It does not appear that either of these avenues were pursued in Father's case.

was represented by counsel, testified on his own behalf. Child's guardian *ad litem* was present at the hearing.[3]

Ms. Gutshall testified that Father did not comply with his goals of maintaining contact with Child, maintaining communication with CYS, attending court hearings, or attending CYS meetings and treatment plan meetings. *See* N.T., 6/4/18, at 6-10. During cross-examination by Father's counsel, Ms. Gutshall acknowledged that Father was continuing to make efforts "to the best of his ability due to his incarceration." *Id.* at 20.

On redirect examination by CYS's counsel, Ms. Gutshall asserted that Father could have done more, explaining that:

> If you see based on the documentation here, [C]hild was placed in June of 2016. We did not receive any contact or a birthday card in October of 2016. So our concern is that after countless conversations with him, his counselor, the letters that we sent, his mother, his sister, as far as what he could have done, he failed to do it.
>
> We talked to him repeatedly to obtain an attorney so that he could be present and make sure his rights were represented in court. He failed to do that for a whole entire year up until the point of 2017. So our concern is that he could have written a lot more than once a month. He could have engaged a lot more than what he did and he did not.

*Id.* at 22.

---

[3] The trial court did not appoint separate legal counsel for Child. *See In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017). However, as discussed below, Child expressed a preference to be adopted by a foster family, although she wished to remain in contact with Father.

Ms. Gutshall indicated that Child is aware of Father's role in her life prior to his incarceration. *Id.* at 20. When asked by Father's counsel whether Child had any fear or hostility towards Father, Ms. Gutshall stated "no, not at all, just more so emotions as far as missing him." *Id.* According to Ms. Gutshall, Child wants to be adopted by her foster family, but wants to remain in contact with Father. *Id.* at 15, 20. Ms. Gutshall testified that Child is in therapy, as she is "struggling emotionally." *Id.* at 23.

Child's guardian *ad litem* stated that "for the record, I talked to [C]hild on a number of occasions, and at seven she's very confused, conflicted, upset about the whole process." *Id.* at 47. Child's guardian *ad litem* stated that Child is "very comfortable where she is with" foster parents, but also that Child "misses her sister; in one breath [she] would want to go where her sister is with that foster parent. . . ." *Id.* The guardian *ad litem* did not indicate that Child wanted to return to Father's care. *Id.* at 47-48. The guardian *ad litem* further stated that Child did not want to live with Father's mother. *Id.* at 48.

At the conclusion of the hearing, the trial court issued its determination that termination of Father's parental rights was appropriate under Sections 2511(a)(2) and (b). The court authored a separate Rule 1925(a) opinion further explaining its decision.

As to Section 2511(a)(2), the trial court initially acknowledged that Child would be in Father's custody if he was not incarcerated, which would not be a "bad thing." N.T., 6/4/18, at 51. The court noted that Father "could do very little in prison[,]" but indicated that Father had made an effort to maintain his

relationship with Child and utilized the resources available to him in prison. *Id.* The court acknowledged CYS's argument that Father's efforts did not "really start in earnest until there was a termination" but stated that it would give Father "the benefit of the doubt." *Id.* The court also found that Father participated in prison programs and did not "have any misconducts or infractions," which showed "a light at the end of the tunnel for him . . . ." *Id.* at 52. The court noted that an incarcerated parent is "expected to utilize the resources available, and it appears that [Father] is." *Id.*

The trial court nevertheless concluded that Father could not meet Child's essential needs from prison, and because he would be incarcerated for "another year or more," Child's need for permanency should not be delayed. *Id.* at 53. The court noted that Child did not have stability or consistency "up until the time of foster care," and her needs could not be put on hold. *Id.*

After Father filed his appeal, the trial court offered a different rationale in its Rule 1925(a) opinion:

> We find Father's contact with [Child] and participation in parenting programs during incarceration to be belated. Although Father knew of [Child's] placement in June 2016, he delayed writing to her until May 2017. Father began earnest action in prison programs only after the finding of Aggravated Circumstances in July 2017, more than one year after [Child] came into placement. We found Father's attempts to explain delays in his participation in prison programs, as caused by others, to lack credibility. Such explanations do not excuse his lack of timely action to protect his parental rights.

Trial Ct. Op., 8/16/18, at 7.

Initially, I am troubled by the trial court's shifting rationales in its statements at the hearing and its Rule 1925(a) opinion. First, the court's initial finding that Child lacked permanency and stability before placement in foster care ignores the uncontradicted evidence that Father played an active role in Child's life before his incarceration. *See* N.T., 6/4/18, at 14-15. Second, the court's initial finding that Father made reasonable efforts while in prison contradicts its later conclusion that Father's efforts to protect his parental rights were belated. *See id.* at 51; Trial Ct. Op. at 7. In my view, these inconsistencies suggest that the trial court failed to consider the full context of the case, and further undermine the court's conclusion that termination of Father's parental rights was warranted under Section 2511(a)(2).

In order to terminate parental rights based on incapacity, the following three elements must be met: (1) repeated and continued incapacity; (2) such incapacity has caused the child to be without essential parental care, control or subsistence necessary for her physical or mental well-being; and (3) the causes of the incapacity cannot or will not be remedied. *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015).

As to incarceration, it is well settled that

> incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the

parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

**In re Adoption of S.P.**, 47 A.3d 817, 830 (Pa. 2012) (citations omitted).

Here, the trial court concluded that Father's incarceration had rendered him incapable of providing Child with essential parental care. **See** N.T., 6/4/18, at 51. The record arguably supports this conclusion.[4]

However, I cannot agree that there was sufficient evidence presented to establish that Father's parental capacity cannot or will not be remedied. **See**, **e.g.**, **S.P.**, 47 A.3d at 831 (holding that the father's release from prison would not remedy his parental incapacity, as he would still be required to enter a halfway house; further, because he was incarcerated since the child's birth, he did not have a relationship with the child and he lacked the skills necessary to care for a child with special needs); **see also In re E.A.P.**, 944 A.2d 79, 85 (Pa. Super. 2008) (stating that the mother's ability to remedy her parental incapacity was not a "reasonable prospect," despite her participation in prison programs, as she had failed to parent her child for the past ten years, had no relationship with the child, and was a registered sex offender).

Unlike in **S.P.** and **E.A.P.**, the uncontroverted evidence demonstrates that Father was an active parent for the first five years of Child's life. Child

---

[4] Under the circumstances of this case, I would disagree with the trial court's conclusion. However, our standard of review is narrow, and "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion." **S.P.**, 47 A.3d at 827.

knows Father, remembers his role in her life prior to his incarceration, and has indicated that she misses him. Further, CYS presented no evidence of other factors that would impede Father's ability to parent Child upon his release from prison.[5] *See S.P.*, 47 A.3d at 831 (concluding that the parent could not remedy their incapacity, as the parent had no relationship with the child prior to their imprisonment and faced additional barriers to their ability to parent even if they were released on parole); *E.A.P.*, 944 A.2d at 85 (same).

Therefore, I would conclude that the trial court's findings and statements of reasons do not support its decision to terminate Father's parental rights under Section 2511(a)(2). Under the circumstances of this case, I discern no record support for a finding that Father's incapacity cannot or will not be remedied.

To the extent that the majority reviews the trial court's ruling as to Section 2511(b), I am constrained to disagree with the decision to affirm. At the termination hearing, the trial court reasoned:

> [B]ased on everything that's been presented here, we believe [termination is] in the best interest of [C]hild -- and [C]hild bonded with [her] present family. It doesn't mean the child doesn't love the parent.
>
> I believe [C]hild loves [F]ather. I think it's -- there's confusion because it's been inconsistent. Particularly [F]ather hasn't been with the child for over two years, and, I mean, that has a significant impact on a young child.

---

[5] Father will be eligible for parole in July 2019, approximately one year from the date of the termination hearing.

N.T., 6/4/18, at 53.

In its Rule 1925(a) opinion, the trial court stated:

The record is devoid of evidence of a bond with Father which, if broken, would cause detriment to [Child].

We recognize that Father seeks additional time within which to prove that he can properly parent after release from incarceration, which would occur in 2019, at the earliest. In deciding the issue of the best interests of a child, our appellate courts have noted that it is essential to allow a child "a chance to have his [or her] fundamental needs met without the constant insecurity that comes with knowing that someday, perhaps in the unreasonably distant future, [he or she] might again be wrenched away from his committed and capable caregiver." *In re N.C.*, 763 A.2d 913, 919 (Pa. Super. 2000). This [c]ourt has grave concerns about the impact upon [Child] of additional years of uncertainty and ultimately, the potential of removal from a foster home which has provided love, security and stability.

Trial Ct. Op. at 8. The trial court concluded that Child's need for permanency and stability outweighed any potential bond to Father. *See* N.T., 6/4/18, at 53.

Section 2511(b) does not make specific reference to an evaluation of the bond between parent and child, but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 483 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

We have stated that "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citing *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.

Super. 2008)). Moreover, the burden is upon the petitioner "to prove the grounds for termination of parental rights under [Section 2511(b)] by clear and convincing evidence." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citing *S.P.*, 47 A.3d at 821–822).

Here, the uncontradicted evidence established that Father was a good father to Child, and there was no indication, aside from Father's incarceration, that the bond was detrimental. *See* N.T., 6/4/18, at 15, 53. Although Father's incarceration caused instability in Child's life, there were several indications in the record that Child was deeply troubled over the possibility that her bond with Father could be severed permanently. *See id.* at 20-23, 47.

Therefore, I cannot agree with the trial court's conclusion that "[t]he record is devoid of evidence of a bond with Father which, if broken, would cause detriment to [Child]." Trial Ct. Op. at 8. Given the trial court's limited analysis, I am of the view that the court failed to afford the "utmost attention" to the effects of terminating Father's parental right on Child. *See T.S.M.*, 71 A.3d at 267. Indeed, our Supreme Court has explained that "attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact." *Id.* at 270.

Therefore, I respectfully dissent.