**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 231 EDA 2022 |

Appeal from the Order Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002974-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 232 EDA 2022 |

Appeal from the Decree Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000295-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 234 EDA 2022 |

Appeal from the Order Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000721-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A16009-22

|  |  |  |
|---|---|---|
|  | : |  |
|  | : |  |
|  | : |  |
| APPEAL OF: S.P., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 235 EDA 2022 |

Appeal from the Decree Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000486-2021

|  |  |  |
|---|---|---|
| IN THE INTEREST OF: J.J.A., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|  | : |  |
|  | : |  |
| APPEAL OF: S.P., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 236 EDA 2022 |

Appeal from the Order Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002973-2017

|  |  |  |
|---|---|---|
| IN THE INTEREST OF: J.J.A., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|  | : |  |
|  | : |  |
| APPEAL OF: S.P., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 237 EDA 2022 |

Appeal from the Decree Entered December 15, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000294-2019

BEFORE:   McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 2 -

MEMORANDUM BY McLAUGHLIN, J.:       **FILED SEPTEMBER 6, 2022**

S.P. ("Mother") appeals from the orders changing the permanency goals for her three minor children to adoption and the decrees involuntarily terminating her parental rights to the children. Mother argues she was substantially compliant with the dependency court's directives and that changing the permanency goals to adoption and terminating her parental rights was not in the children's best interests. We affirm the decrees terminating Mother's parental rights and dismiss as moot the appeals from the goal change orders.

Mother has three children with J.J.A., Sr. ("Father"): J.J.A., Jr. ("J.A.") (born 2015), A.G.A. ("A.A.") (born 2017), and S.R.A. ("S.A.") (born 2020). The Department of Human Services ("DHS") became involved with the family in August 2017, prior to S.A.'s birth, after learning that J.A. and A.A. were living in a home infested with cockroaches and that A.A. required intensive medical care, including a gastronomy tube. DHS was informed that Mother and Father were "intellectually delayed" and unable to properly care for the children. Trial Court Opinion, filed 3/17/22, at 4.

DHS engaged Family Empowerment Services to assist the family. However, DHS subsequently received several General Protective Services ("GPS") reports about the family. The reports stated that Mother and Father were failing to provide adequate medical care for the children and refusing an in-home nurse for A.A. The home and children were also reported to be dirty and unkempt, and Mother and Father had "unidentified disabilities or delays."

*Id.* at 4-5. DHS investigated further and found the parents unable "to grasp the severity of [A.A.]'s condition" and observed that J.A. was developmentally delayed. Dependency Petition, 11/15/17, ¶ 5, at l., m. DHS reported,

> [A.A.] was hospitalized due to complications from a G-tube and ear infection. [A.A.] has a genetic disease called 22Q11 and cardiac issues. She has a g-tube that is not kept clean and the parents are not feeding correctly causing the child to lose weight. There was a nurse coming to the home but [M]other "fired" her and refuses services. . . . DHS visited the home and found it to be inappropriate for a medical[ly] needy infant. The home is overcrowded, numerous animals in the home and feces from the animals throughout the home. There [are] only two beds and one is covered with dirty laundry. It was also learned that [J.A.], age 2 is autistic. He was receiving services through Child Link but [M]other also stopped allowing Child Link to continue working with [J.A.].

Order for Protective Custody, 11/18/17, at 3 (unpaginated). At one point, A.A.'s heart medication ran out and the parents did not refill the prescription because they thought A.A. no longer needed it. Trial Ct. Op. at 7.

DHS obtained an Order of Protective Custody for J.A. and A.A. in November 2017. Following a shelter care hearing, DHS placed J.A. in kinship care with his maternal great-aunt ("Maternal Aunt"). A.A. was transferred from the hospital to a medical facility and later to a pediatric specialty group home.

The court held an adjudicatory hearing and adjudicated the children dependent. The court referred the parents to the Behavioral Health System ("BHS") for a psychological evaluation and IQ testing and to the Achieving Reunification Center ("ARC"). The court ordered DHS to create a Single Case

Plan ("SCP") and to refer the parents for parenting capacity evaluations ("PCEs") and Family School. DHS was also to refer J.A. for early intervention services. The court ordered the parents to have supervised visits with the children. *See* Order of Adjudication and Disposition, 11/17/17.

In March 2018, an initial Single Case Plan ("SCP") was created. Mother's objectives included:

- obtain appropriate housing;

- attend ARC and adhere to all recommended services;

- participate in the PCE;

- complete an individual therapy program at Joseph J. Peters Institute;

- attend all medical appointments for the children;

- attend scheduled visits with Children; and

- sign all necessary releases.

*See* Trial Ct. Op. at 11.

The SCP was later revised to add: compliance with Intellectual Disability Services ("IDS"), treatment at Community Organization for Mental Health and Retardation ("COMHAR"), and demonstrate household skills, including budgeting. *Id.* at 12-14. The court held periodic permanency review hearings to monitor the parties' progress.

In June 2020, Mother gave birth to S.A. prematurely. Upon S.A.'s discharge from the NICU, DHS obtained an order of protective custody and placed S.A. with Maternal Aunt. The court adjudicated S.A. dependent in

September 2020 and ordered that the parents have liberal visits with the children while supervised by Maternal Aunt. Mother appealed the adjudication of dependency, arguing that she had been compliant with her DHS service directives. This Court affirmed, finding the evidence at the adjudicatory hearing substantiated the court's finding that Mother still lacked the capacity to parent S.A. *See Int. of S.A.*, 253 A.3d 278 (Pa.Super. 2021).

The court revised the SCP in March 2021, adding that Mother and Father were to participate in a domestic violence assessment. Trial Ct. Op. at 19-20. DHS placed A.A., whose leg had been surgically amputated and was wheelchair-bound, with Maternal Aunt that July. N.T., 12/15/21, at 65.

The following month, DHS filed petitions to change the permanency goals for the children to adoption and for involuntary termination of Mother's and Father's parental rights to the children under Sections 2511(a)(1), (2), (5), and (8).[1] *See* 23 Pa.C.S.A. § 2511.

At a hearing on the termination and goal-change petitions, in December 2021, the court heard expert testimony from Dr. William Russell, a licensed psychologist at Forensic Mental Health Services. He had completed the PCE for Mother in July 2018. Dr. Russell opined that both parents had developmental delays, and that due to Mother's difficulty with functioning independently, and in light of J.A.'s developmental delays and A.A.'s medical

---

[1] DHS had filed an initial set of petitions for J.A. and A.A. in April 2019 which the court had held in abeyance. *See* Permanency Review Order, J.A., 1/21/20, at 2; Continuance Order, J.A., 6/11/19, at 1.

needs, Mother "does not present with the capacity to provide safety and/or permanency to her Children." Trial Ct. Op. at 23.

Dr. Russell said he had been troubled by Mother's inability to recognize any problems with her children or describe their significant needs. Mother told Dr. Russell that she did not see anything wrong with her children and that she did not understand what was happening. *Id.* at 24. Dr. Russell testified he had additional concerns with whether Mother has since found stable housing, whether Mother has learned to budget, and whether there is domestic violence in the household. *Id.* at 25. He further noted that "if Mother is not consistent with attending visits with her children, then it raises the question of how she is going to meet the children's needs on a 7-day a week, 24-hour-a-day basis." *Id.* at 25-26.

Dr. Russell testified that although he had assessed Mother in 2018, any unaddressed concerns with Mother's parenting ability would persist. *Id.* at 26. Dr. Russell testified that Mother may never acquire the capacity to safely parent, even if she completes all the recommendations. He explained that attending therapy and parenting classes "does not mean that what was presented will be internalized and transferred to other surroundings." *Id.* at 25.

The court also heard the testimony of Tiyonna Pelzer, the case manager with the Community Umbrella Agency ("CUA") from September 2020 through August 2021. Pelzer testified that when she was on the case, Mother had enrolled in mental health treatment and completed a PCE, IDS services,

parenting classes, and Family School. *Id.* at 27. However, Pelzer testified that A.A. has significant medical issues and J.A. is autistic, and "there were ongoing concerns" with Mother's ability to meet their needs. *Id.* at 26-27. Pelzer testified that Mother does not understand why the children are in DHS care and the issues involved, despite various conferences on the subject. *Id.* at 27.[2] When Mother would receive paperwork that she did not understand, she would bring it to Pelzer to explain it to her. N.T. at 61. Pelzer further testified that Mother never complied with the objective of making a household budget. Trial Ct. Op. at 27. Mother also failed to show Pelzer any documentation regarding her right to live in the property where she resides with Father and his mother. *Id.* at 28.

Furthermore, Mother reported multiple times that Father was abusing her, but Mother refused to attend any domestic violence counselling. *Id.* at 26-27, 28. According to Pelzer, "She said they're -- they're just not doing it." N.T. at 59. Pelzer also testified, "[Mother] has demonstrated that when it's

_____

[2] When asked whether Pelzer believed Mother understood her role and why the children were in care, Pelzer responded,

> When I first got the case and my initial visit at Mom and Dad's home, they were blaming everyone else that their – why their children got taken away from them. And still, now – when – before I left, Mom didn't understand. She was blaming grandmom, at the time that I left, why her children wasn't allowed to come home. And I had to explain to Mom that it wasn't Grandmom's fault why the children couldn't come home.

N.T. at 53.

occurring that she's afraid of [Father]. I don't think she would be able to protect her children." *Id.*

Regarding Mother's relationship with the Children, Pelzer testified that Mother had trouble obtaining transportation passes to visit the children once Maternal Aunt moved to New Jersey, and Mother would not go on visits without Father. Trial Ct. Op. at 28. She said that Mother has no parental bond with A.A. or S.A., and when Mother would visit S.A., the child would "just scream and cry." *Id.* at 28-29. Pelzer stated that J.A. does recognize her as his mother. *Id.* However, J.A. looks to Maternal Aunt to meet his needs. N.T. at 63. When Mother did not visit, J.A. would not ask about her, and sometimes he would ask for his maternal uncle. *Id.* at 64. According to Pelzer, "[a]ll three [c]hildren are bonded to the Maternal Aunt and look to her for love, protection, and support." Trial Ct. Op. at 29. Pelzer believes the children would not suffer irreparable harm if Mother's parental rights were terminated and that it would be in the children's best interests to be adopted by maternal Aunt. *Id.*

DHS also presented the testimony of Danielle Enguero, the CUA case manager as of October 2021. Enguero testified that Mother did not sign new releases that would allow her to confirm Mother's continuing mental health treatment, and Mother has not provided Enguero with any documentation showing she is entitled to live at her residence. *Id.* at 29. Enguero testified she has not been able to refer Mother to counseling for domestic violence, because Mother has not signed the necessary authorizations. *Id.* Enguero

further testified that Mother failed to attend a medical visit for A.A. in November of 2021, when A.A. was sick and hospitalized. *Id.*; N.T. at 98.

Enguero stated that Mother has not been consistent with visiting the children and does not confirm her visits 48 hours in advance to allow Enguero to purchase the train fare. Trial Ct. Op. at 29. Enguero testified that all three children now live with Maternal Aunt and that they "are very well adjusted in the Maternal Aunt's home and are thriving." *Id.* at 30. J.A., who is autistic, attends first grade, and A.A., who has an in-home nurse five days a week, has enrolled at the same school. *Id.*; N.T. at 102. S.A. has no special medical or developmental needs. Trial Ct. Op. at 30.

The court-appointed child advocate for the two older children also addressed the court. She stated that J.A. is 6 years old and A.A. is 4 years old, and they both have special needs. *Id.* After visiting the children twice, the child advocate "could tell they were loved and well taken care of and they both wanted to stay with Maternal Aunt." *Id.* at 30.

Mother testified that she is unemployed and receives Supplemental Security Income payments. *Id.* at 30. She attends mental health therapy at COHMAR, seeing a doctor monthly and a therapist every two weeks. *Id.* Mother completed training in financial planning, parenting, and Family School, and was trained at CHOP to maintain A.A.'s G-Tube and perform CPR. *Id.* at 30-31. She pays her phone bill and navigates public transportation to attend her appointments. N.T. at 125-26. Mother testified she is not notified regarding her children's medical appointments, and that she has had to pay

out-of-pocket for visits to her children. Trial Ct. Op. at 31. She also stated she refuses to go to domestic violence counseling because she does not need it; but, convinced by her attorney that it was mandatory, she tried to call the CUA worker and supervisor, and neither have answered the phone or responded to her voicemails. ***Id.***

The court granted the petitions, having found DHS provided clear and convincing evidence of the statutory requirements for termination pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) and that adoption is in the best interest of the children.

Mother appealed,[3] and raises the following:

A. Whether the trial court erred in law and/or abused [its] discretion when it changed the goal from reunification to adoption when Mother was substantially compliant with her SCP objectives.

B. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)?

C. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

Mother's Br. at 5 (unnecessarily capitalization and answers below omitted).

---

[3] Father also appealed from the decrees involuntarily terminating his parental rights to the children. His appeals are docketed at Nos. 238, 239, and 240 EDA 2022.

Mother characterizes this appeal as being "about whether disabled parents have a right to raise their children and/or remain in their children's lives." *Id.* at 9. Mother first contends that the court erred in changing the goal to adoption, because the testimony established she had completed all her SCP objectives with the exception of domestic violence counseling. Mother argues she completed IDS services, was enrolled in mental health treatment, moved into a stable home with Father, was attending A.A.'s medical visits, and completed parenting classes. She argues the objective of domestic violence counseling was not added until June 2021, and she did not complete this final objective because "[t]he CUA never stated that she signed mother up for domestic violence counseling and stated that you have to ask the new worker." *Id.* at 10. Mother also complains she was "not give[n] an opportunity to demonstrate her ability other than in Family School." *Id.* She also maintains that the court never had Mother re-evaluated to determine whether she needed additional services or training "to demonstrate that she could provide safety and stability for her children." *Id.* at 10-11.

Mother further argues the court erred in finding grounds for termination of Mother's parental rights under § 2511(a). Mother claims that she had substantially completed her SCP, and, although she was given an additional objective of domestic violence counseling "right before" the termination petitions were filed, she was willing to work towards that objective, and the reason she had not yet done so is that the new CUA worker had failed to issue a referral. *Id.* at 12. Mother also argues grounds for termination were not met

under Section 2511(a) because she did not have a settled purpose of relinquishing her parental claim to her children.

Finally, Mother argues the court erred in terminating her parental rights under Section 2511(b) because it is not in the best interests of the children. She argues that she consistently visited the children until their caretakers moved to New Jersey,[4] which created an obstacle for Mother because she did not drive and had to pay her own way on public transportation, and that the CUA was inconsistent with providing Mother with transportation funds.

We will first address Mother's issues regarding termination of her parental rights. We review the termination of parental rights for an error of law or abuse of discretion. *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). So long as the record supports them, we will accept the factual findings and credibility determinations of the trial court. *Id.*

The party seeking involuntary termination of parental rights must establish, by clear and convincing evidence, that termination is warranted under Sections 2511(a) and (b). *See* 23 Pa.C.S.A. §§ 2511(a), (b); *In re Z.S.W.*, 946 A.2d 726, 728 (Pa.Super. 2008). The statutory grounds for termination listed under Section 2511(a) focus on the conduct of the parent. 23 Pa.C.S.A. § 2511(a); *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa.Super. 2006).

---

[4] Mother also argues there "was no legitimate reason given why the caregivers were allowed to move to New Jersey vers[us] remaining in Philadelphia." Mother's Br. at 13. Mother did not raise this issue before the trial court, and it is therefore waived. Pa.R.A.P. 302(a).

Under subsection 2511(a)(8), termination is warranted when:

The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Under this subsection, a parent's willingness or ability to remedy the conditions that initially caused the placement, and the efficacy of reunification services, do not factor into the analysis. *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa.Super. 2006); *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super. 2003). This is because, after 12 months of placement, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* (quoting *In Re: J.T. and R.T.*, 817 A.2d 505, 509 (Pa.Super. 2003)). Even if the parental incapacity is inherent and faultless, "the law is clear that parents who are incapable of performing parental duties are no less unfit than parents who refuse to perform them." *See In re: N.C.*, 763 A.2d 913, 918 (Pa.Super. 2000).

If the court determines that grounds for termination have been established under Section 2511(a), the court must then determine whether termination of parental rights is in the child's best interest under Section 2511(b). That provision states, "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional

needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). A major component of this analysis "concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007).

The court credited the testimony of Dr. Russell, who had evaluated Mother's capacity for parenting in 2018, as well as that of Pelzer and Enguero, the two caseworkers providing reunification services to Mother. *See* Trial Ct. Op. at 23, 26; N.T. at 143-44. The court also relied on its "own history with this case, having adjudicated and presided over many review hearings." N.T. at 144-45.

The court observed that the older children have been in placement for over four years and Mother still lacked the capacity to safely parent them. Regarding the progress made by the parents, the court opined,

> [W]hat I heard today was that the parents have not changed their status regarding their ability to parent these children. They may have attended some classes. They may have . . . completed some classes and gotten attendance, but -- and it's a phrase that the doctor used: compliance is not competence. . . . And it's important because the same status exists now. While the parents have partially complied with the requirements, they complied with the requirements when they feel like it.
>
> * * *
>
> The other issues involved are the parents' inability to understand the needs of these children, understand the ability to—they do not have the ability to understand communications which may attend all of the treatment and care for the children. . . . They would need someone to read those documents and interpret them for them in

- 15 -

order for them to understand the needs of the children. And the needs of these children are not simple needs.

* * *

[T]he parents have not progressed one bit in their understanding of the case, of their understanding of the needs of the children, [and] have not progressed in their ability to parent, [which] is the key issue here.

When you have children with needs like this, the children's needs are escalated, and the parents have to have the ability to meet that escalation. The parents haven't changed their ability to meet the needs of these children since the children were taken into care. They've not demonstrated any additional ability to parent these children.

*Id.* at 139, 140, 144-45.

The court also considered the children's needs and welfare, and Mother's bonds with the children. It credited the testimony that A.A. does not want to reunite with Mother, that S.A. has never been in Mother's care, and that neither have a parental relationship with Mother. *Id.* at 141, 144. The court found that while J.A. recognizes his Mother, the testimony established that Mother and J.A. do not share a parental bond. *Id.* at 144. The court also relied on the testimony that the children are receiving care and security from Maternal Aunt, and there would be no irreparable harm if Mother's rights were terminated. *Id.* The court concluded,

[M]y test is not whether you're going to be sad because I'm going to terminate your parental rights. It's whether terminating the parental rights is in the best interest of the children and are we going to be able to provide a better future for these children when they're in someone else's care? And the answer for me is a resounding yes for all three children, supported by evidence which is clear, convincing, and essentially uncontradicted.

***Id.*** at 145.

The record supports the trial court's conclusion that DHS presented clear and convincing evidence supporting involuntary termination of Mother's parental rights under Subsections (a)(8) and (b). ***See*** 23 Pa.C.S.A. § 2511(a)(8), (b). It is uncontradicted that all three children have been removed from Mother's care for a period exceeding 12 months.

In addition, the conditions leading to the removal of the children persist: Mother lacks the capacity to provide adequate medical care for her children, consistently attend medical appointments and visits, and make satisfactory choices regarding her children's safety, such as providing a home free of domestic violence. The court credited the testimony that, two years after Dr. Russell had expressed the same concern, Pelzer, who left the case in 2020, found that Mother could not grasp the issues at hand, fully understand important communications without assistance, or understand why the children were in placement in the first place. Although the objective of domestic violence counseling was added to Mother's SCP approximately six months before the termination hearing, Mother made no progress toward this goal, and the trial court credited the testimony that this was due to Mother's refusal to pursue the goal or sign the necessary authorizations.

Finally, the evidence supports that termination best suits the needs and welfare of the children—relevant here under both subsection 2511(a)(8) and (b). The children have no parental bond with Mother, and are thriving with Maternal Aunt, who is willing to adopt them.

For the foregoing reasons, we affirm the decrees terminating Mother's parental rights to the children. As we affirm termination under Subsection (a)(8), we need not determine whether grounds for termination were established under the other subsections. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*) (stating this Court need only affirm the court's decision as to one subsection under Section 2511(a)).

Mother's challenge to the permanency goal change is moot given our decision to affirm the involuntarily termination of Mother parental rights. *See Int. of A.M.*, 256 A.3d 1263, 1272-73 (Pa.Super. 2021) (finding issues regarding goal change moot in light of termination of parental rights); *see also In re D.K.W.*, 415 A.2d 69, 73 (Pa. 1980) (stating once parental rights are terminated, issues of custody and dependency under Juvenile Act are moot). We therefore dismiss the appeals from the orders granting the petitions for goal change.[5]

Decrees terminating Mother's parental rights affirmed. Appeals from goal change orders dismissed as moot.

---

[5] If the appeals from the goal change orders were not moot, we would affirm the orders. A court is required to consider the factors listed in 42 Pa.C.S.A. § 6351(f), and ultimately decide a child's placement under a best interest standard. *Int. of D.R.-W.*, 227 A.3d 905, 917-18 (Pa.Super. 2020). As discussed above, the record supports the trial court's determination that adoption is in the children's best interests.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/6/2022