J-A23014-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.D.A., III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.M.A., MOTHER | : | No. 755 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0008a

| | | |
|---|---|---|
| IN THE INTEREST OF: E.J.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.M.A., MOTHER | : | No. 756 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0009a

| | | |
|---|---|---|
| IN THE INT. OF: R.M.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.W.A., MOTHER | : | No. 757 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0010a

| | | |
|---|---|---|
| IN THE INT. OF: A.B.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.W.A., MOTHER | : | No. 758 MDA 2022 |

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0019a

IN THE INTEREST OF: B.W., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
APPEAL OF: T.W.A., MOTHER : No. 759 MDA 2022

Appeal from the Decree Entered April 20, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2022-0007a

BEFORE:    BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

DISSENTING MEMORANDUM BY McCAFFERY, J.:

**FILED DECEMBER 14, 2023**

Respectfully, I disagree with the Majority's conclusion that the orphans' court decision to terminate Mother's parental rights, as to all five Children,[1] was not an abuse of discretion. Instead, I would conclude the orphans' court, which was in agreement that both Parents have successfully complied with drug treatment, did not address the consistent testimony by multiple service providers across several hearings, including the termination proceedings, that both Parents have been in compliance with their housing, parenting, and mental health goals. My rationale is not that the court erred in accepting the testimony of one witness over other evidence, but rather that the court failed to address extensive testimony that was in direct contradiction of the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] As two children have the initials, "E.A.," I will refer to E.A., III, as "Ed.A." and E.A. as "El.A."

testimony it cited. In light of this incomplete review, I would disagree there was clear and convincing evidence to support termination of "one of the oldest fundamental rights protected by the Due Process Clause' of the Fourteenth Amendment."[2] Thus, I dissent.

The Majority aptly summarizes that at the time the five Children were adjudicated dependent,[3] CYF's concerns were both Parents' drug abuse, mental health, parenting skills, financial stability, and home environment. **See** Memorandum Opinion in Support of Order Pursuant to Rule 1925(a)(2)(ii) of the Pennsylvania Rules of Appellate Procedure, 6/17/22 (Trial Ct. Op., 6/17/22), at 7-8.

Although Mother's instant appeal lies from the April 20, 2022, termination order, I consider the evidence, adduced at hearings within the five months preceding that decision, to be relevant.

### I. November 10, 2021, Status Review Hearing

---

[2] **See K.W. v. S.L.**, 157 A.3d 498, 502-03 (Pa. Super. 2017) (citation omitted).

[3] The four older children were adjudicated dependent on September 16, 2020. At that time, their ages were approximately: B.W., six; Ed.A., five; R.A., two; and El.A., one. A.A. was born thereafter, in June of 2021, and adjudicated dependent almost two weeks later, on July 12, 2021.

- 3 -

First, at a status review hearing on November 10, 2021,[4] Parents averred the criminal investigation of their alleged abuse — for which CYF received a referral 10 months earlier — was "ongoing" but had "gone nowhere[.]" N.T., 11/10/21, at 8-9. The orphans' court directed CYF to conduct an independent investigation and provide a finding of "indicated" or "unfounded" by the next hearing in three months' time.[5] *Id.* at 8-9; Status Review Order, 11/10/21.

Jessica Myers, a family therapist with Pressley Ridge, testified Parents' housing was appropriate. N.T., 11/10/21, at 23. Although there was a damaged ceiling, Parents were working with their landlord to repair it. *Id.* at 27. Parents reported their rent was paid through January. *Id.* I note Parents have lived in the same five-bedroom apartment rental since October of 2020. N.T., 4/1/22, at 199. Ms. Myers further testified that a family advocate developed a family budget, and both Parents were "very independent in

---

[4] CYF caseworker Kristen Marshall did not testify at this hearing. Furthermore, I note that at this time, R.A. and El.A. lived together in kinship foster placement with D.V., their paternal grandmother. *See* N.T., 4/1/22, at 17, 216. The other three children — B.W., Ed.A., and A.A. — were living with another foster family, but shortly after the November 10, 2021, hearing, they moved to D.V.'s home so that the siblings would stay together. *Id.* at 216; N.T., 11/10/21, at 7-8.

[5] CYF additionally reported that on October 19, 2021, Father entered a no contest plea to disorderly conduct. N.T., 11/10/21, at 59. This charge arose from "fighting" and Father received a sentence of 12 months' probation. Status Review Order for B.W., 11/10/21, at 2.

searching for new employment." N.T., 11/10/21, at 35-36. Father was employed through People Ready and he provided payment history for three pay periods. *Id.* at 35, 37, 62.

The following testimony about visitation was presented. Parents attended all visits and had never cancelled. N.T., 11/10/21, at 50. Ms. Myers, who supervised three visits, testified "[P]arents are progressing appropriately" and showed "positive changes." *Id.* at 24. Michelle Mahoney, a family advocate with Pressley Ridge, also supervised visits and testified that generally, the visits were going well. N.T., 11/10/21, at 47-48. In earlier visits, Mother "was not consistent with her boundary setting" or consequences, but since participating in family therapy, she had improved, and the Children's behaviors improved as a result. *Id.* at 48. Jessica Weymer, another family advocate with Pressley Ridge, supervised the visits with respect to A.A. (then five months old) only, and she did not have any concerns with Parents' visits. *Id.* at 55. Ms. Mahoney and Karen Rose, a CYF caseworker supervisor, both recommended increased visitation and moving visits into the community. *Id.* at 53, 59-60. The Children's guardian *ad litem*, David Worley, Esquire (GAL), agreed with these recommendations. *Id.* at 64.

Ms. Myers testified Parents each have a therapist through True North, and Mother had a drug and alcohol counselor through Pyramid Healthcare. N.T., 11/10/21, at 28. With respect to drug treatment, Mother's recovery

specialist, Janelle Wiland, testified Mother was compliant.[6]  *Id.* at 57.

Previously, Father was taking five milligrams of methadone, then took one

milligram for one day, and chose to stop.  *Id.* at 63-64.  He was successfully

discharged from methadone treatment on November 8, 2021.  *Id.* at 28-29.

At the conclusion of this hearing, **the orphans' court commented**

**positively** on both Parents' progress:

> . . . I think [Father's attorney] said it very well[, that Father was complying with the objectives.]  You want to put a team in place. You want to see them do their thing and you want to see the [P]arents cooperate.  So far these [P]arents have done that.  And this case is headed in the right direction.  I'm pleased.  Please keep up the good work.

N.T., 11/10/21, at 64.  The court scheduled the next hearing for January 11,

2022.  *Id.* at 66.

## II.  December 27, 2021, CYF Report

Meanwhile, on December 27, 2021, CYF caseworker Kristen Marshall

filed a report,[7] which concluded — contrary to the evidence at the status

hearing approximately seven weeks earlier —that Mother and Father made

"[m]inimal progress" under the permanency plan.  CYF Report at 2, 4.  The

report acknowledged both Parents "typically . . . maintain contact with" CYF

---

[6] Ms. Wiland also testified at the April 1, 2022, termination hearing, going by her now married surname, Kelley.  N.T., 4/1/22, at 172.

[7] Caseworker Marshall filed five nearly identical reports — one for each child. For ease of discussion, I refer to these in the singular.

and service providers, but stated they were "unresponsive to" Caseworker Marshall's email messages, sent on December 21, 22, 23, and 27, seeking to schedule an interview for the outstanding CPS investigations. *Id.* at 2.

The CYF report further alleged the following. The paystubs presented by Parents lacked identifying information; Parents also failed to provide proof that rent and bills were paid, bank statements, their driver licenses, vehicle registrations, and proof of insurance. CYF Report at 2-5. Parents visited "the kinship home unannounced five or six times," and purchased $300 Apple iPads for the four older children for Christmas. *Id.* at 3, 5. Finally, the CYF report stated that petitions for the involuntary termination of Parents' rights were "in the process of being filed." *Id.* at 7. Nevertheless, CYF recommended "a continued primary goal of Reunification and a concurrent goal of Adoption." *Id.* at 8.

### III.  January 11, 2022, Permanency Review Hearing

The orphans' court conducted the next permanency review hearing on January 11, 2022. Despite the fact that CYF had not filed any petition for a goal change and, again, its report filed two weeks earlier recommended a continued primary goal of reunification, the orphans' court changed the primary goal to adoption at the end of this hearing.[8]  N.T., 1/11/22, at 49.  As

_____

[8] Both Parents have appealed from the goal change orders: Mother at Superior Court Dockets 295 through 299 MDA 2022 and Father at Dockets 201 through 205 MDA 2022.  Those appeals remain pending.

this hearing predated the filing of the termination petitions by less than two weeks, and the termination orders by a mere three months, I review this proceeding in detail.

First, CYF reported it found both Mother and Father indicated as perpetrators of physical abuse against both El.A. and B.W. N.T., 1/11/22, at 7. The parties acknowledged that a finding of abuse hearing was scheduled for March 10, 2022. *Id.* at 5.

Following these introductory remarks by the parties, the orphans' court commented that "with the exhibits that we already have and so forth, [including Caseworker Marshall's report,] we really don't need to hear any testimony[.]" N.T., 1/11/22, at 7. Mother's attorney protested, and the court permitted examination of Caseworker Marshall. *Id.* at 8.

Caseworker Marshall testified to all of the following: although Parents have made "moderate" progress with their drug treatment, CYF had not observed the "stability needed for five children in the home." N.T., 1/11/22, at 10. "[P]artial visitation has still not been recommended," and when she observed one visit the prior July, it was "chaotic without appropriate boundaries . . . in disciplining and cleaning up and the [C]hildren fighting." *Id.* at 10, 15-16. Furthermore, Father failed to provide proper documentation for his employment. N.T., 1/11/22, at 14. Although Caseworker Marshall received bank statements from Pressley Ridge family advocate Yashira Luciano, some portions were "blacked out." *Id.* at 19. In any event, the

documents received did not "align with the proposed budget," and the electric or gas bill had a balance of $1,796.14. *Id.* at 20.

The testimony of the other witnesses at this hearing, however, was that Parents were successfully complying with their goals. Ms. Luciano testified that the previous night, she inspected Parents' home and concluded it was appropriate, and opined Parents achieved the goal of having appropriate housing. N.T., 1/11/22, at 24-25, 23-25, 30. Ms. Luciano further stated: she prepared a family budget; Parents were in programs for paying the electric and gas bills; and the landlord provided her with a receipt showing rent was paid. N.T., 1/11/22, at 26, 28. Mother showed Ms. Luciano documentation of salary deposits to her bank account. *Id.* at 29. Ms. Luciano sent Caseworker Marshall the financial information that was requested, and explained, "The items that were blacked out . . . were not related to employment that needed to be verified." *Id.* at 26-27. Significantly, Ms. Luciano recommended that her services come to a successful end: "The family no longer needs advocacy. There are no other concerns or needs that the family would need to complete." *Id.* at 25.

Nicole Lam, Mother's drug and alcohol counselor at Pyramid, testified Mother was meeting the expectations of her treatment and her "[p]rognosis is very good." N.T., 1/11/22, at 34. However, in September of 2021, Ms. Lam had an hour-and-a-half telephone conversation with Caseworker Marshall. *Id.* Ms. Lam "found a lot of [Caseworker Marshall's] comments to

be bias[ed], often derogatory, unprofessional," and "[v]ery stigmatized[.]" *Id.* at 35. For example, Caseworker Marshall made "generalizations concerning . . . addicts," stated Mother was "lazy" and "uses that as an excuse to relapse," and speculated that Parents were involved in "drug deals." *Id.* Ms. Lam disagreed with this portrayal of Mother, and she had no concerns with Mother's compliance with her drug program. *Id.*

Pressley Ridge family therapist Jessica Myers, testified that at visits, Parents have been providing "more structure and boundaries" and showing "much more consistent follow through[.]" N.T., 1/11/22, at 37. Ms. Myers opined that moving the visits to Parents' home would be appropriate **if** the family were on track to reunification. *Id.* at 40. However, in light of CYF's indication it would file a termination petition, Ms. Myers would not recommend visits in the home. *Id.* at 39-40, 41.

At the conclusion of the hearing, the orphans' court agreed with the GAL's oral recommendation to "flip the goals." N.T., 1/11/22, at 49. The court thus amended the primary goal to adoption, with a concurrent goal of reunification. *Id.* Shortly thereafter, on January 19 and 27, 2022, CYF filed petitions to terminate Parents' parental rights.

Meanwhile, on March 10, 2022, the orphans' court conducted the finding of abuse hearing. It heard testimony that B.W. disclosed, *inter alia*, that he and El.A. were "being beat" and slapped, sometimes with a belt. **See** N.T.,

3/10/22, at 12. The court rendered a finding that both Father and Mother were perpetrators of abuse against B.W. and El.A.[9] *Id.* at 53-54.

### IV. April 2022 Termination of Parental Right Hearings

Finally, with respect to the April 1 and 18, 2022, termination hearings, while the orphans' court and Majority have reviewed the testimony of Caseworker Marshall, I consider in detail the testimony of the other witnesses. First, it was reiterated that Father was successfully discharged from the drug program. N.T., 4/1/22, at 26-27. Mother was also successful in her drug treatment. *Id.* at 173.

Ms. Lam, Mother's Pyramid drug and alcohol counselor, testified to the following. She has been working with Mother for more than a year, and Mother has produced "negative" drug tests for 19 months. N.T., 4/1/22, at 30-31. Although she is not required to, Mother attends almost weekly sessions, in addition to a weekly "advanced outpatient" program. *Id.* at 31. Since September of 2021, Mother has been consistently taking 45 milligrams of methadone, her progress was "[v]ery good," and Ms. Lam had no concerns "at all" about Mother's drug usage. *Id.* at 31, 35, 38.

---

[9] As the Majority notes, both Parents appealed from this abuse finding. On December 28, 2022, this Court affirmed as to Mother (Dockets 545 & 546 MDA 2022) and on August 28, 2023, this Court affirmed as to Father (Dockets 117 & 118 MDA 2023).

Ms. Lam again testified, as she did at the January 11, 2022, hearing, about "biased" statements made by Caseworker Marshall in a conversation in September of 2021. N.T., 4/1/22, at 33. Caseworker Marshall "kept mentioning that she thought there was ongoing drug use, even though [Ms. Lam] confirmed [Mother] has been compliant in all aspects of her treatment." *Id.* at 34. Ms. Lam described this conversation as "[c]onfusing" and appearing to focus on how the Parents were failing, rather than how they could assist them.[10] *Id.* at 32-33.

With respect to visits, Ms. Mahoney, the Pressley Ridge family advocate, testified that visitation increased in September of 2021. N.T., 4/1/22, at 52. The family therapist, Ms. Myers, worked with Parents on parenting skills and managing the Children's behaviors, and both Parents have made "tremendous" progress. *Id.* at 56, 70. *See also id.* at 78. Ms. Mahoney

---

[10] Additionally, CYF caseworker Patrick Duggan briefly testified to the following. He began working with CYF approximately one month earlier, and specifically with Caseworker Marshall on Parents' case one week earlier. *See* N.T., 4/1/22, at 134. Caseworker Marshall made "biased" comments to Mr. Duggan, such as, "[T]his family was trashy," and Mother "was bitchy." *Id.* at 136-38.

Following Mr. Duggan's testimony, the orphans' court stated that while it would reserve judgment as to the credibility of Caseworker Marshall, it understood that employees in the judicial system sometimes comment "about the dire nature of their jobs and the cases out of sheer frustration," and it was "not going to let Ms. Marshall leave [the] courtroom thinking [the court found] she did . . . a terrible thing. They were words said in frustration." N.T., 4/1/22, at 167-68.

would feel comfortable with unsupervised visits, but due to the then-ongoing abuse investigation, such visits were not permitted by the orphans' court. *See id.* at 62, 68. Additionally, Pressley Ridge generally does not conduct visits in the family home if there is no "solid plan" for reunification, and here, they did not "want to upset the [C]hildren by having visits in the home, if that's not where [they are] sure [the case is] headed." *Id.* at 73.

With respect to the bonds between Children and Parents, Ms. Mahoney also testified to the following. All the Children enjoy the time they spend with Parents, and they feel safe around Father. N.T., 4/1/22, at 61, 63. At most visits, B.W. articulates that he does not want the visits to end, and he tells his parents, "I love you." *Id.* at 59-60. R.A. is "particularly attached to [M]other," and while she also goes to Father, "she just tends to want to spend time with [M]other." *Id.* at 64-65. With respect to Ed.A., Ms. Mahoney did not observe any indication he was fearful of or not comfortable with Parents. *Id.* at 68. El.A. is "very attached" to Father, and is affectionate with both Parents. *Id.* at 69.

Ms. Myers testified both B.W. and Ed.A. have a connection and healthy relationship with both Parents. N.T., 4/1/22, at 97, 98. Both boys express not wanting visits to end, and express frustration that they cannot see Parents more often or go to other places with Parents. *Id.* at 99. R.A. and El.A. have good relationships with Parents as well. *Id.* at 101-02. Both Parents share

in caring for A.A.'s needs, including changing diapers, feeding him, and holding and playing with him. *Id.* at 102.

Meanwhile, Caseworker Marshall, had observed one visit before the filing of the termination petition filing — on June 23, 2021 — and one visit thereafter, on February 16, 2022. *See* N.T., 4/18/22, at 25-26. She acknowledged the oldest child, B.W., has a parental bond with Parents, he is happy and excited to see them, and he has indicated he would like to be reunited with Parents. *Id.* at 209, 218. She stated Ed.A., R.A., and El.A. all similarly have a bond with Mother and Father, although these three Children had not indicated to her whether they would like to reunite with Parents. *Id.* at 210-11, 220-21; N.T., 4/18/22, at 37. Nevertheless, Caseworker Marshall opined termination would not have any long-term, negative impact on any of these Children. N.T., 4/1/18, at 238-39.

As stated above, Parents have been living in the same home since October of 2020. N.T., 4/1/22, at 199. Caseworker Marshall conducted home inspections on November 20 and December 24, 2020, and additionally attempted to inspect the home on August 20, 2021, and January 10, 2022, but was denied entry. N.T., 4/18/22, at 46-47. Caseworker Marshall, along with her supervisor Karen Rose, made an unannounced home visit on March 24, 2022 — approximately one week before the first termination hearing. N.T., 4/1/22, at 200. They observed: a "heavy" smell of animal feces and urine; "piles" of animal feces in the trash can; a dog "peeing sporadically" in

the house; space heaters throughout the house, including one atop a laundry basket; and no sink in the only bathroom. *Id.* at 200-01, 203. With regard to the ceiling in Parents' bedroom, although there was a repair, there was still "an active leak." *Id.* at 201. Caseworker Marshall initially stated there was no bed set for the youngest child, A.A., but on cross-examination, she acknowledged there was a crib, but it had not been set up. *Id.* at 201; N.T., 4/18/22, at 17. In sum, she opined Parents could not provide safe and appropriate housing for the Children. N.T., 4/1/22, at 204.

Ms. Myers was re-called to the witness stand, and she testified she visited Parents' home five days earlier, on April 13, 2022, observed no safety issues, and had no concerns with visitation being held in the home. N.T., 4/18/22, at 130, 133-34. There was a strong odor of bleach on the first floor, and Mother stated she had cleaned the kitchen. *Id.* at 131. On the second floor, there was a smell of a litter box, but it was "not overpowering," and on the third floor, she could smell cat food. *Id.* Ms. Myers did not notice any pet feces or urine, aside from the litter box, and there was a puppy pad, which was not saturated in urine or feces. *Id.* at 132-33. The bathroom had a new sink, with running hot and cold water. *Id.* at 132. Finally, Ms. Myers stated both Parents were currently receiving mental health treatment from True North, and she opined Parents did not need "new advocacy services." *Id.* at 136-37.

Finally, I review Parents' testimony. Father stated he has been working for one month as full-time as a flooring subcontractor. N.T., 4/18/22, at 95. Prior to that, he worked one month at Wolfgang Candies through a temp agency. *Id.* at 96-97. Before that, Father worked as a subcontractor for a fence company for almost one year. *Id.* at 97. He stated that over the past year, there were only a few days or a week that he did not work. *Id.* at 97.

Mother testified she has been working at a pizza restaurant for approximately five weeks. *See* N.T., 4/18/22, at 148. Prior to that, she worked at Wolfgang Candies for one month, along with Father, but they left because the 12-hour shifts conflicted with their drug testing schedule. *Id.* at 148-49. Before that, Mother worked at FedEx for one month, but she had the same 12-hour shift issue. *Id.* at 149. Mother also worked for Wonolo for one month, and before that, she did not work as she was pregnant. *Id.* at 149-50. Mother stated she informed the Pressley Ridge team of changes in her employment and believed the information was forwarded to Caseworker Marshall. *Id.* at 162. Mother also signed releases for Pressley Ridge to obtain documentation of her rent and utilities. *Id.* In November of 2021, their electricity was turned off, but Mother made a $90 payment and it was turned on within 20 minutes. *Id.* at 163.

Both Parents testified they had mental health treatment through True North, and they did not know they were discharged until the first termination hearing on April 1, 2022. N.T., 4/18/22, at 99, 113, 152-53. They were

discharged due to not completing insurance paperwork that was required every 30 days. *Id.* at 100, 153. Father had an appointment with True North the following day, and Mother was treating with them monthly for four months, and did not miss any appointments. *Id.* at 99, 153-54.

With respect to their home, Father testified the prior bathroom sink was old, and he made an agreement with the landlord to replace the sink in exchange for a credit toward the rent. N.T., 4/18/22, at 111, 122-23. They lacked an operable bathroom sink for approximately one month. *Id.* at 111. They used puppy pads inside the house for a dog who has a disabled leg, but this dog also relieves itself outside. *Id.* at 110.

Father stated he loved and missed the Children, and he had good relationships with them. N.T., 4/18/22, at 101-02, 104. Mother similarly testified she had good relationships with each Child. *Id.* at 157-60. Both Parents stated they had a good relationship with each other. *Id.* at 119, 178. Upon questioning by B.W.'s legal counsel, both Parents agreed it was not appropriate to strike children out of frustration or use "implementations" when disciplining Children. *Id.* at 116-17, 176. Mother, however, denied she or Father have ever inappropriately disciplined the Children. *Id.* at 180. Both Parents stated they attended the Children's medical appointments when they were able to. *Id.* at 106, 165. A.A. was born with a club foot, and Mother attended his foot appointments. *Id.* at 165.

At the end of the second day of hearings, the orphans' court terminated both Parents' parental rights to all five Children. N.T., 4/18/22, at 203. In support, the court cited the physical abuse, the Children's safety, and Parents' refusal to admit wrongdoing. ***Id.***

## V. Standard of Review

I incorporate the Majority's discussion of the applicable standard of review. I reiterate that the party seeking termination bears the burden to establish statutory grounds for termination with clear and convincing evidence. ***See In re N.C.***, 763 A.2d 913, 917-18 (Pa. Super. 2000).

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

The Pennsylvania Supreme Court has stated: "[W]here a parent is satisfactorily working toward a reunification, [CYF] should continue to facilitate such progress and parental termination is inappropriate." ***In re H.S.W.C.-B***, 836 A.2d 908, 910 (Pa. 2003) (citations omitted & paragraph break added). I am mindful that "'the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental

rights protected by the Due Process Clause' of the Fourteenth Amendment."

***K.W.***, 157 A.3d at 502-03 (citation omitted).

### VI. Termination as to A.A. Under Subsection 2511(a)(5)

First, I consider Mother's discussion that although CYF's petition sought termination under Subsections 2511(a)(1), (2), (5), and (8) (and 2511(b)), the orphans' court analysis discussed (5) and (8) (and (b)) only. ***See*** Mother's Brief at 21. At the termination hearing, Father's counsel asked the court to specify the Section 2511(a) subsections under which it was entering termination.[11] The court merely replied, "I think you should address the sections that [CYF] put in the petitions." N.T., 4/18/22, at 205. In its opinion, while the orphans' court quoted the text of Subsections 2511(a)(1), (2), (5), (8), and (b), its analysis addressed only Subsections (5) and (8). ***See*** Trial Ct. Op., 6/17/22 at 4-5, 30 ("The Court finds that [CYF] has carried its burden under 23 Pa.C.S.A. § 2511(a)(**5**) and (**8**)."). In light of this discussion, I would agree with Mother that this Court should construe that termination was premised on these only these latter subsections — 2511(a)(5) and (8) (and (b)).[12] ***See*** Mother's Brief at 21.

---

[11] ***See*** N.T., 4/18/22, at 204 (Father's counsel asking, "[F]or purposes of appeal . . . are you going to specifically say under which subsection so that we can address that?").

[12] Nevertheless, Mother additionally addressed Subsections 2511(a)(1) and (2), in order to avoid waiver of any issues. Mother's Brief at 21-23.

Subsections 2511(a)(5) and (8) provide:

**(a) General rule. —** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5), (8).

First, Subsection (a)(5) includes the removal of the child "from the care of the parent" for at least six months. *See* 23 Pa.C.S. § 2511(a)(5). Here, A.A. was never in Mother's care. He was born with drug withdrawal symptoms, stayed at the hospital for nine days, and was adjudicated dependent at 13 days old. *See* Order of Adjudication & Disposition for A.A., 7/12/21, at 1. Caseworker Marshall testified he has "always been outside the

care and custody of his parents." N.T., 4/11/22, at 213. **See** Trial Ct. Op., 6/17/22, at 38 ("A.A. has been dependent since birth."). Thus, under the plain meaning of the statute, I would conclude termination of Mother's rights as to A.A. under Subsection 2511(a)(5) was mistaken.[13] **See** 23 Pa.C.S. § 2511(a)(5), (8). On this ground, I would reverse the termination order as to Mother's parental rights to A.A.

### VII. Termination Under Subsections 2511(a)(5) & (8)

With respect to termination of the Mother's parental rights as to the older four Children under Subsections 2511(a)(5) and (8), I incorporate the Majority's summary of Mother's arguments on appeal.

Concerning Mother's drug treatment goals, the orphans' court's opinion refers positively to the testimony that she has made progress throughout this matter. **See** Trial Ct. Op., 6/17/22, at 14, 19, 29, 32. However, the court denied that Parents' substance abuse was the sole basis for removal of the Children, and maintains that instead, "from the beginning," major concerns included whether Parents had a safe home environment and financial stability to care for five small children. **See id.** at 7-8. The court stated a "pattern" emerged, in which Parents were doing well with drug testing, but did not have

---

[13] Furthermore, CYF's termination petition as to A.A. cited only Subsections 2511(a)(1), (2), and (5) — and not (a)(8). **See also In re Adoption of C.L.G.**, 956 A.2d 999, 1006 (Pa. Super. 2008) (*en banc*) (applying Subsection 2511(a)(8) where child tested positive for cocaine at birth and was removed from mother's care at four days old).

a suitable home environment and refused to submit financial documentation to CYF. *Id.* at 8.

With respect to Parents' housing, the orphans' court cited evidence presented at the: (1) February 10, 2021, permanency review hearing, that there was dog feces on the floor, and R.A. and Mother had lice; (2) August 5, 2021, permanency review hearing, that Catholic Charities reported the home appeared appropriate at times, but at other times there was extreme clutter, bugs, smells, and trash; and (3) January 11, 2022, permanency review hearing, that Ms. Myers only observed the living room and did not inspect the rest of the home at Parents' request.[14]  Trial Ct. Op., 6/17/22, at 11, 16, 19-20.

I emphasize, however, that the orphans' court did not address — either positively or negatively — the extensive, consistent testimony given by the Pressley Ridge witnesses that the home was safe and appropriate.  I reiterate that at the November 10, 2021, status review hearing, Ms. Myers testified Parents' five-bedroom apartment was appropriate and Parents were resolving the issue of the bedroom ceiling with their landlord.  N.T., 11/10/21, at 23. At the January 11, 2022, permanency review hearing, Ms. Luciano testified

---

[14] The orphans' court cited, however, Parents' reason for requesting Ms. Myers to not inspect the other rooms: Parents were packing and planning to move "because the landlord was not being cooperative."  Trial Ct. Op., 6/17/22, at 20.

that: one day earlier, she inspected Parents' living room, kitchen, and the Children's proposed bedrooms; the ceiling was repaired and required only finishing and painting; and **her services should come to an end because Parents achieved the goal of having appropriate housing**. N.T., 1/11/22, at 23-25, 30-31.

At the April 1, 2022, termination hearing, Ms. Myers stated: she visited Parents' home five days earlier; she did not observe any pet feces or urine, aside from a litter box that merely needed changing; there was a working sink in the bathroom; and she had no concerns with safety issues nor with visitation being held in the home. N.T. 4/18/22, at 130-34.

It is clear that in a termination appeal, we accept the orphans' court's credibility determinations if they are supported by the record. *See In re D.L.B.*, 166 A.3d at 325-26. Here, the Majority holds the court's credibility findings — crediting the testimony of Caseworker Marshall — is supported by the record. *See* Maj. Memo. at 13. However, in my view, in addressing Parents' housing goals, the orphans' court did not address at all the testimony by the Pressley Ridge witnesses, including Ms. Luciano's statement, three months earlier, that Parents have met their goal of appropriate housing, to the extent she suggested her services come to a successful end. *See* N.T., 1/11/22, at 25. Given the lack of any discussion of the above testimony, which came later in time than the initial observations cited in the orphans'

court's opinion, I cannot agree that the housing conditions, which led to Children's removal, continued to exist. *See* 23 Pa.C.S. § 2511(a)(5), (b).

Next, I review the orphans' court's finding that Parents have failed to provide proper documentation "that would help to present a clear picture of financial stability." *See* Trial Ct. Op., 6/17/22, at 21. The court's opinion properly cited Caseworker Marshall's testimony, as well as CYF supervisor Ms. Rose's testimony, over several hearings, that Parents either failed to present any proof of employment, or provided handwritten notes that were not sufficient. *See id.* at 13, 16, 21. The court also acknowledged Ms. Luciano's testimony, at the January 11, 2022, hearing, that she accepted bank statements, with some entries covered in black marker, as sufficient proof of employment. *Id.* at 21-22. At the termination hearing, both Parents testified as to their current employment and most recent employment. *See* N.T., 4/18/22, at 148-49.

I acknowledge CYF's evidence that Parents failed to consistently provide proof of income that was acceptable to the agency. I agree with the orphans' court's concern that Parents must comply with CYF's request to provide authentic and reliable financial documentation. Nevertheless, in light of the evidence that Parents have successfully met their drug treatment, housing, and parenting goals, I would decline to affirm the termination of Mother's parental rights on the ground she failed to provide proper financial documentation. I am mindful that "the right to make decisions concerning

the care, custody, and control of one's children is one of the oldest fundamental rights" protected by our Constitution. **See K.W.**, 157 A.3d at 502-03. **See also In re Bowman**, 647 A.2d 217, 218-19 (Pa. Super. 1994) ("The complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the children."). I thus disagree there was clear and convincing evidence that Mother cannot or will not remedy her financial instability, or that financial stability continues to exist. **See** 23 Pa.C.S. § 2511(a)(5), (8).

Next, I consider the orphans' court's finding — stated at the termination hearing in support of termination — that Parents have failed to take responsibility for the physical abuse of the Children. N.T., 4/18/22, at 203. The court's opinion also cited a Justice Works Discharge Report, which noted Mother did "not take accountability for the impact her substance abuse has had on her [C]hildren. [Mother] denies the [C]hildren experiencing trauma despite being removed from the home after witnessing [her] overdosing in the home." Trial Ct. Op., 6/17/22, at 27. I do not minimize the findings of abuse made against both Parents, for the abuse that occurred prior to the Children's removal in August of 2020. However, I also consider that the orphans' court has not meaningfully addressed the extensive testimony by Pressley Ridge witnesses that Mother has since made great progress in her parenting skills and that visits were going very well.

- 25 -

Both Parents met weekly with family therapist Ms. Myers.  N.T., 4/1/22, at 75, 87.  Five months before termination was entered, Ms. Mahoney, CYF supervisor Karen Rose, and the GAL all agreed with a recommendation to increase visitation and move visits into the community.  ***See*** N.T., 11/10/21, at 53, 59-60, 64.  At the termination hearing, Ms. Mahoney testified she would feel comfortable with unsupervised visits despite the ongoing abuse investigation, noting such visits were not permitted because of the investigation.  N.T., 4/1/22, at 62, 68.  Ms. Mahoney also only opposed visits in the home at that time because the goal was not currently reunification.  ***Id.*** at 73.  Finally, Ms. Myers likewise testified she would agree with partially supervised visits.  ***Id.*** at 107-08.

In its opinion, the orphans' court considered that the service providers "did not recommend a move to partial supervised visits **until recently,**" after the four older Children have been adjudicated dependent for 20 months.  ***See*** Trial Ct. Op., 6/17/22, at 10, 43 (emphasis added).  However, the court does not explain why these **current** recommendations militate against reunification, nor why they should be disregarded solely due to the length of time passed.  In the absence of such discussion, I would decline to affirm the termination orders on the ground of Mother's parenting skills.

In light of all the foregoing, I would disagree with the orphans' court's conclusion there was clear and convincing evidence supporting termination.  ***See In re N.C.***, 763 A.2d at 917-18.  "Clear and convincing" evidence is

evidence that is so "clear, direct, weighty and convincing as to enable the [trial court] to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***See In re R.N.J.***, 985 A.2d at 276. I would thus reverse the orphans' court's termination of Mother's parental rights as to the four older children, B.W., Ed.A., R.A., and El.A., under Subsections 2511(a)(5) and (8).

## VIII. Termination Under Subsection 2511(b)

Having determined that termination was improper under Subsection 2511(a), I would not reach the merits of termination under Subsection 2511(b). ***See In re L.M.***, 923 A.2d at 511 (termination under Section 2511 requires a bifurcated analysis, and only if the court determines the parent's conduct warrants termination does the court engage in the second part of the analysis pursuant to Section 2511(b)). ***See also*** Mother's Brief at 28-30 (addressing Subsection 2511(b)). Nevertheless, I would opine the orphans' court likewise failed to address the testimony summarized above, by the multiple Pressley Ridge witnesses, about the bonds between the Children and Mother. Caseworker Marshall likewise acknowledged there is a bond. While she also offered her opinion that termination would have no long-term, negative impact on any of the Children, I emphasize she observed only one visit prior to the filing of the termination petition (10 months before the filing). ***See*** N.T., 4/1/18, at 238-39; N.T., 4/18/22, at 25-26.

## IX.  Claim of Bias Against Caseworker Marshall

In Mother's next issue, she avers the orphans' court erred or abused its discretion in accepting the "biased" testimony of Caseworker Marshall. Mother's Brief at 30.  The orphans' court addressed this claim of bias, and properly pointed out it was the court's purview to weigh the witnesses' testimony and credibility.  ***See In re D.L.B.***, 166 A.3d at 325-26; Trial Ct. Op., 6/17/22, at 39.  In light of my discussion above, that reversal of the termination orders would be appropriate, I would not reach the merits of this claim.  Nevertheless, I emphasize my rationale is not that the orphans' court should not have believed Caseworker Marshall, but rather than the court failed to address the testimony of the Pressley Ridge and other agency witnesses.

## X.  Conclusion

For the foregoing reasons, I would reverse the orders involuntarily terminating Mother's parental rights to her five Children, B.W., Ed.A., R.A., El.A., and A.A.